184 Cal.App.4th 739 (2010)
110 Cal.Rptr.3d 31
REYNALDO A. MALDONADO, Petitioner,
v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.
No. A126236.
Court of Appeals of California, First District, Division Five.
May 13, 2010.
As modified May 17, 2010.
*747 Paul F. DeMeester for Petitioner.
No appearance for Respondent.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Brent W. Wilner, Deputy Attorneys General, for Real Party in Interest.

OPINION
BRUINIERS, J.
Petitioner Reynaldo A. Maldonado is awaiting trial in the Superior Court of San Mateo County on an information charging him with special circumstance murder while lying in wait. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15).)[1] He notified the prosecution of his intent to introduce evidence, through designated expert witnesses, of neurocognitive deficits he purportedly suffers as a result of childhood brain trauma or congenital brain dysfunction. The prosecution thereafter successfully moved for an order, pursuant to Evidence Code section 730, compelling Maldonado to submit to examinations by court-appointed experts, including a psychiatrist, a psychologist, and a neurologist.
Maldonado's efforts to overturn that order through writ of mandate and/or prohibition were rejected in both this court and in the California Supreme Court. (Maldonado v. Superior Court (Sept. 4, 2009, A125920) [petn. den.]; Maldonado v. Superior Court (Sept. 23, 2009, S176084) [review den.].) Maldonado also concurrently filed motions in the trial court seeking certain protective orders relating to the court-ordered examinations. On September 9, 2009, the court granted the requested protective orders in part, but otherwise denied them. Among the requested protective measures sought and denied were orders that would have barred the disclosure of the results of any of the examinations to the prosecution unless and until Maldonado actually presented his own mental health evidence at trial, and then only after an in camera hearing at which the trial court would determine which materials should be disclosed. He further objected to prosecution participation in selection of the appointed experts. Maldonado again seeks a writ of mandate/prohibition challenging denial of seven of his requested protective orders.
We issued an alternative writ of mandate directing the superior court to set aside and vacate its order denying five of the requested protective measures, *748 or to show cause why a peremptory writ of mandate should not issue. The trial court declined to modify its order. We then stayed proceedings, ordered briefing, and scheduled the matter for argument.
Having received and considered the People's return to order to show cause and Maldonado's reply to the return, and the argument of counsel, we will issue a peremptory writ permitting the examinations to proceed, but directing the trial court to delay disclosure of those portions of the examination reports containing statements by Maldonado until he has an opportunity to challenge disclosure of materials potentially still subject to privilege, despite the fact that he has placed his mental state in issue. We hold that Maldonado must be given an opportunity to assert a claim of privilege, at least initially in camera, with redaction of any material as to which a privilege claim is sustained, before disclosure to the prosecution. We reject Maldonado's contention that disclosure of the examination results and supporting data must be deferred until defense evidence on his mental state is adduced at trial. The prosecution is entitled to access to the full reports before trial so that it has a reasonable opportunity to prepare its rebuttal case and subject Maldonado's evidence to meaningful adversarial testing at trial. We find no error in the trial court's consideration of prosecution recommendations in the court's appointment of experts to examine petitioner.

I. BACKGROUND
Petitioner Reynaldo A. Maldonado is charged with the murder of Quetzalcoatl Alba. (§ 187, subd. (a).) The special circumstance that the murder was committed while petitioner was lying in wait is alleged.[2] (§ 190.2, subd. (a)(15).) Defense counsel retained the services of three mental health professionals as part of an investigation into the mental state issues in the case: Jeff Kline, Ph.D., a psychologist; Peter Cassini, M.D., a neurologist; and Robert Perez, Ph.D., a neuropsychologist. As part of its reciprocal discovery obligations, the defense provided the prosecution with mental health evidence resulting from this investigation, including statements made by Maldonado to the examiners.
The prosecution then asked the trial court to appoint experts pursuant to Evidence Code section 730 to conduct physical, psychological and psychiatric examinations of Maldonado. Over Maldonado's objection, the court granted the motion. Maldonado petitioned this court for relief from the order by extraordinary writ. We denied the petition and the Supreme Court denied review. (Maldonado v. Superior Court, supra, A125920; Maldonado v. Superior Court, supra, S176084.)
*749 Immediately after the trial court granted the prosecution's motion to appoint experts, Maldonado filed a motion asking the court to implement protective measures he asserted were required to preserve his Fifth and Sixth Amendment rights with respect to the examinations. The first category of requests involves Maldonado's efforts to restrict the prosecution's access to the examinations and to the expert reports. As relevant here, he asked the court to allow defense counsel and a defense expert to observe the examinations and to obtain reports, notes and recordings of the examinations within 24 hours of their creation, but to restrict the prosecution's access to that same information. The specific requests in issue were:
"5) To prohibit any district attorney, attorney general, U.S. attorney, or special prosecutor, or any of their respective staff, or any of their law enforcement agents, including but not limited to Daly City Police, San Mateo County Sheriff's Office, from being present during the conduct of any of the examinations of defendant by any of the Evidence Code section 730 Court-appointed experts;
"6) To prohibit access by any officials referred to under item 5 to any of the reports, notes and/or recordings of the examinations and investigations by any of the experts appointed by the Court pursuant to Evidence Code section 730 until after the close of the defense case at the jury trial of the above-mentioned case, upon which the Court will inspect, in camera, any such reports, notes, and/or recordings of the examinations and investigations resulting from the Court's appointment to determine whether the prosecution should have copies of such reports, notes and/or recordings;
"7) To decide the question of admissibility of any of the evidence adduced as a result of the work of the experts appointed by the Court pursuant to Evidence Code section 730 only after the steps in item 6 have been completed and only upon a hearing at which both parties have the right to be heard;
"8) To prohibit any officials referred to under item 5 from any contact with any experts appointed by the Court under Evidence Code section 730 until after the Court's in camera decision referred to in item 6 and only if the Court grants the prosecution permission to do so; [¶] ... [¶]
"10) To require the experts appointed pursuant to Evidence Code section 730 to maintain confidentiality regarding their examinations and investigations of defendant with the exceptions [of providing information to the defendant as allowed by other protective measures] as well as the exception that said experts will provide the Court with copies of their notes, reports and recordings, immediately following the conclusion of their work." (Italics omitted.)
*750 In a supplemental motion, Maldonado challenged the prosecution's participation in selecting the experts. As relevant here, he asked the court to:
"24) Exclude any experts contacted by the People from consideration and appointment pursuant to Evidence Code section 730;
"25) Prohibit [the] People from contacting any further experts for the purpose of possible appointment pursuant to Evidence Code section 730; the Court to direct the Probation Department to select the appropriate experts without any input whatsoever from either party."
The prosecution argued that both the defense and prosecution should be permitted to observe the examinations, but from a separate room with simultaneous video monitoring rather than from the examination room itself. The prosecution also argued that both the defense and prosecution should have access to the experts and to reports, notes and recordings of the examinations promptly after their creation, and that the admissibility of evidence resulting from the examinations should be determined before jury selection. With respect to requests Nos. 24 and 25, the prosecution argued it was appropriate for it to assist the court in identifying Spanish-speaking doctors available to take such an appointment.
Following a hearing on September 8, 2009, the trial court granted certain of Maldonado's requests in part, and denied the remainder, including requests Nos. 5, 6, 7, 8, 10, 24 and 25. The court ruled that both the defense and prosecution could observe the examinations from a separate room by simultaneous video monitoring as proposed by the prosecution. The court denied the request to preclude prosecution access to reports, notes and recordings of the examinations until after close of the defense case and in camera review, as well as the request to delay determination of the admissibility of the evidence until after those events and a court hearing on the matter. The court also denied the request to prevent any prosecution contact with experts who might be candidates for appointment by the court. The court then appointed as experts three individuals whose names and resumes had been provided to the court by the prosecution: Jose R. Maldonado, M.D., a psychiatrist; Shelly Perry, Ph.D., a neuropsychologist; and Jaime Lopez, M.D., a neurologist.
On September 29, 2009, Maldonado filed this petition for writ relief challenging the court's denial of his requests for protective measures Nos. 5, 6, 7, 8, 10, 24 and 25 on Fifth and Sixth Amendment grounds. He sought a stay of trial court proceedings pending resolution of the writ petition.
We stayed the court-ordered examinations, but not the trial, and asked for informal opposition to the petition. After receiving that opposition and a reply *751 by Maldonado, we issued an alternative writ of mandate. We explained: "It appears to this court that respondent superior court erred in its disposition of petitioner's request numbers 5, 6, 7, 8 and 10.... [¶] Absent petitioner proffering evidence at trial pertinent to the Evidence Code section 730 examinations, the superior court's disposition of petitioner's request numbers 5, 6, 7, 8 and 10 appears to violate petitioner's Fifth Amendment rights. (See Estelle v. Smith (1981) 451 U.S. 454, 468 [68 L.Ed.2d 359, 101 S.Ct. 1866] [`A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.']; Buchanan v. Kentucky (1987) 483 U.S. 402, 422-423 [97 L.Ed.2d 336, 107 S.Ct. 2906] [elaborating on the foregoing statement from Estelle v. Smith, supra, as follows: `This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.']; In re Spencer (1965) 63 Cal.2d 400, 412-413 [46 Cal.Rptr. 753, 406 P.2d 33] (Spencer); People v. Williams (1988) 197 Cal.App.3d 1320 [243 Cal.Rptr. 480]; and see Petn., pp. 22-27.) The Attorney General's reliance on United States v. Stockwell (2d Cir. 1984) 743 F.2d 123 to support the superior court's ruling does not appear persuasive." In an immediately following footnote, we wrote: "Although it appears the Fifth Amendment issues asserted by petitioner have merit, the Sixth Amendment issues raised by petitioner appear moot and/or unmeritorious. Additionally, petitioner's objections to the superior court's rulings on request numbers 24 and 25 (concerning the expert selection process) appear unmeritorious. Consequently, the alternative writ will not address those issues."
The alternative writ commanded the trial court to either (a) vacate its September 8, 2009 order with respect to requests Nos. 5, 6, 7, 8 and 10 and enter a new and different order after reconsideration in light of this court's order, or (b) show cause why a peremptory writ of mandate should not issue.
On October 22, 2009, Maldonado's counsel informed us that the trial court had declined to vacate its order and opted to show cause why a peremptory writ should not issue. We were advised that, "Respondent court's choice was made in light of the People's request to follow that course of action and the recent arrest (October 12, 2009) of the codefendant in this case, Mr. Erick Morales, who had been wanted since June of 2001, and whose capture will necessarily delay petitioner's trial (petitioner was arrested on October 15, 2007)." On October 29, we stayed the trial and all further proceedings concerning the court-ordered examinations pending further order of this *752 court, and set a briefing schedule.[3] Our order specified that the "issues to be addressed in this proceeding are limited to the claims raised in the petition herein, regardless of whether those claims were found meritorious in the court's October 14, 2009 order granting the alternative writ."[4]

II. DISCUSSION
Maldonado seeks a writ requiring the trial court to grant protective orders delaying the disclosure of any of the results of the examinations unless and until he presents his own expert evidence at trial, requiring in camera review by the court prior to disclosure, and barring any prosecution involvement in the selection of the court-appointed experts. We first consider whether these matters are appropriately considered on writ review.

A. Propriety of Writ Review

(1) Writ relief by mandamus will lie "to compel exercise of jurisdiction or to correct an abuse of discretion, but it cannot control the exercise of discretion." (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Writs, § 92, p. 624.) "The conditions limiting issuance of the writ of mandamus in criminal cases are similar to those in civil cases. (See generally 8 [Witkin,] Cal. Proc[edure] (4th [ed. 1997]), Extraordinary Writs, §§ 72 et seq., 115 et seq. [inadequacy of appeal or other remedy] ....)" (6 Witkin & Epstein, Cal. Criminal Law, supra, Criminal Writs, § 97, p. 628, italics & citation omitted.)
"[T]he prerogative writ is not the favored method of reviewing discovery orders. Ordinarily the aggrieved party must raise the issue on direct appeal from a final judgment. [Citations.] The premise upon which this general policy rests is that in the great majority of cases the delay due to interim review of discovery orders is likely to result in greater harm to the judicial process by reason of protracted delay than is the enforcement of a possibly improper discovery order. [Citation.]" (Sav-On Drugs, Inc. v. Superior Court (1975) 15 Cal.3d 1, 5 [123 Cal.Rptr. 283, 538 P.2d 739] (Sav-On Drugs).)
Extraordinary review of a discovery order will be granted, however, when a ruling "threatens immediate harm, such as loss of a privilege against *753 disclosure, for which there is no other adequate remedy." (O'Grady v. Superior Court (2006) 139 Cal.App.4th 1423, 1439 [44 Cal.Rptr.3d 72] [subpoena seeking information protected by Cal. reporter's shield privilege (Cal. Const., art. I, § 2, subd. (b))].)
(2) It is well established that writ review of a discovery order is appropriate if the order allegedly violates a privilege of the petitioning party. (Pacific Tel. & Tel. Co. v. Superior Court (1970) 2 Cal.3d 161, 169-170 & fn. 11 [84 Cal.Rptr. 718, 465 P.2d 854] [following Oceanside Union School Dist. v. Superior Court (1962) 58 Cal.2d 180, 185-186, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439] (Oceanside)]; Roberts v. Superior Court (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309] (Roberts); Sav-On Drugs, supra, 15 Cal.3d at p. 5.) Courts routinely entertain writ petitions that raise claims of attorney-client or work product privilege (San Diego Professional Assn. v. Superior Court (1962) 58 Cal.2d 194, 198-199 [23 Cal.Rptr. 384, 373 P.2d 448]; Mitchell v. Superior Court (1984) 37 Cal.3d 591, 594-595 [208 Cal.Rptr. 886, 691 P.2d 642]; Garcia v. Superior Court (2007) 42 Cal.4th 63, 68 [63 Cal.Rptr.3d 948, 163 P.3d 939] (Garcia) [criminal case]; Costco Wholesale Corp. v. Superior Court (2009) 47 Cal.4th 725, 740-741 [101 Cal.Rptr.3d 758, 219 P.3d 736]; Venture Law Group v. Superior Court (2004) 118 Cal.App.4th 96 [12 Cal.Rptr.3d 656] [writ relief granted where discovery order erroneously ordered attorney to violate attorney-client privilege in answering deposition questions]),[5] patient-physician and patient-psychotherapist privilege (Roberts, at pp. 333, 336),[6] marital privilege (Duggan v. Superior Court (1981) 127 Cal.App.3d 267, 269 & fn. 4 [179 Cal.Rptr. 410]), other statutory privileges (County of San Diego v. Superior Court (1986) 176 Cal.App.3d 1009, 1014-1015, 1018-1019 [222 Cal.Rptr. 484] [privilege for the proceedings of government health care oversight committees]; Schnabel v. Superior Court (1993) 5 Cal.4th 704, 708, 720 & fn. 4 [21 Cal.Rptr.2d 200, 854 P.2d 1117] [implied privilege against disclosure of information provided on tax returns]; Sav-On Drugs, at pp. 6-7 *754 [same]), the California constitutional right to privacy (Britt v. Superior Court (1978) 20 Cal.3d 844, 851-852 [143 Cal.Rptr. 695, 574 P.2d 766]),[7] and the state and federal constitutional right to freedom of association (Bodenheimer v. Superior Court (1980) 108 Cal.App.3d 885, 887-888 [167 Cal.Rptr. 26]).
Reviewing courts have also regularly entertained writ petitions challenging, as here, criminal discovery orders allegedly violating a defendant's Fifth Amendment privilege against self-incrimination and the related Sixth Amendment right to the assistance of counsel when being questioned by the prosecution. (See Verdin v. Superior Court (2008) 43 Cal.4th 1096, 1100, 1102 [77 Cal.Rptr.3d 287, 183 P.3d 1250] (Verdin); Prudhomme v. Superior Court (1970) 2 Cal.3d 320, 322 [85 Cal.Rptr. 129, 466 P.2d 673][8]; Centeno v. Superior Court (2004) 117 Cal.App.4th 30, 35-36, 40 [11 Cal.Rptr.3d 533] (Centeno); Baqleh v. Superior Court (2002) 100 Cal.App.4th 478, 482, 485 [122 Cal.Rptr.2d 673] [Court of Appeal first denied writ review, but was directed by Supreme Court to issue an alternative writ]; Woods v. Superior Court (1994) 25 Cal.App.4th 178, 181-182 [30 Cal.Rptr.2d 182] (Woods) [same]; Rodriguez v. Superior Court (1993) 14 Cal.App.4th 1260, 1263 [18 Cal.Rptr.2d 120]; Posner v. Superior Court (1980) 107 Cal.App.3d 928, 930 [166 Cal.Rptr. 123]; McGuire v. Superior Court (1969) 274 Cal.App.2d 583, 586, 590 [79 Cal.Rptr. 155], disapproved on different grounds in Prudhomme, at p. 327, fn. 11; see also Sandeffer v. Superior Court (1993) 18 Cal.App.4th 672, 675 [22 Cal.Rptr.2d 261] [writ review of order requiring disclosure of defense expert reports, which was challenged as exceeding statutory authority]; Torres v. Municipal Court (1975) 50 Cal.App.3d 778, 781, 783-784 [123 Cal.Rptr. 553] [writ review of order requiring disclosure of defense expert's examination, which was challenged as violating 6th Amend. right to assistance of counsel].)
Courts have similarly entertained writ petitions challenging civil discovery orders that implicate the discovery targets' Fifth Amendment privileges. (See People v. Superior Court (Kaufman) (1974) 12 Cal.3d 421, 424 [115 Cal.Rptr. 812, 525 P.2d 716] [writ review of discovery order in civil action brought by the People]; Fuller v. Superior Court (2001) 87 Cal.App.4th 299, 302-303 [104 Cal.Rptr.2d 525] (Fuller) [writ review of civil discovery order that *755 implicated deponents' 5th Amend, privilege]; Avant! Corp. v. Superior Court (2000) 79 Cal.App.4th 876, 878-881 [94 Cal.Rptr.2d 505] [writ review of order denying motion to stay discovery in civil action pending disposition of related criminal case, which was challenged as violating 5th Amend.]; Gonzales v. Superior Court (1980) 117 Cal.App.3d 57, 60-61 [178 Cal.Rptr. 358] [writ review of civil discovery order challenged on ground it violated defendants' 5th Amend. rights]; People v. Superior Court (Taylor) (1975) 53 Cal.App.3d 996, 998 [126 Cal.Rptr. 297] [writ review of discovery order in civil action brought by the People].)
Review by writ has also been found appropriate to review the manner in which a trial court handles pretrial disclosure of materials alleged to be privileged under the Fifth Amendment. (See Centeno, supra, 117 Cal.App.4th at pp. 36, 41-46 [issuing writ directing trial court to rule on relevance of psychiatric tests before requiring defendant to submit to the tests (on the issue of mental retardation as bar to imposition of death penalty)]; Fuller, supra, 87 Cal.App.4th at pp. 302-303, 309-310 [denying without prejudice writ petition challenging trial court refusal to bar civil defendants from testifying about matters on which they invoked their 5th Amend, privilege, and giving trial court guidance on how and when to rule on any privilege claim on remand]; Woods, supra, 25 Cal.App.4th at pp. 181, 187-188 [entertaining writ petition that challenged order requiring pretrial disclosure of defense psychiatric examination on the ground disclosure should be delayed until after defendant presents his own psychiatric evidence at trial].)
The dissent cites Warford v. Medeiros (1984) 160 Cal.App.3d 1035, 1038 [207 Cal.Rptr. 94] (Warford), also involving review of a civil discovery order that allegedly violated a deponent's Fifth Amendment rights, as an exception that proves the rule that writ review is generally inappropriate for claims of Fifth Amendment privilege unless no other opportunity for review is available, or unless the Oceanside standards apply. (Dis. opn., post, at p. 784, fn. 4, also citing Fuller, supra, 87 Cal.App.4th at pp. 308-310; Oceanside, supra, 58 Cal.2d at pp. 185-186, fn. 4.) We do not believe that Warford can be read so narrowly. In that case, the underlying civil action generating the discovery was filed in Hawaii, the deponents were nonparty California residents, and there was a direct appeal from a proceeding initiated by the deponents in a California court to challenge the Hawaii discovery order. (Warford, at pp. 1038-1039.) It was in that context that the court observed that "[A] party normally may not appeal from a discovery order. [Citations.]... However, we think an exception to the general rule exists where, as here, no final review of the underlying action will take place in a California forum." (Id. at pp. 1040-1041.)
In arguing for a more limited scope of writ review here, the dissent seeks to distinguish the multitude of cases that have provided writ review of *756 discovery orders in criminal and civil cases on the ground that Fifth Amendment privileges are infringed, even though the parties might have also raised those claims in a direct appeal from a final judgment.
(3) Citing Chavez v. Martinez (2003) 538 U.S. 760, 767-773 [155 L.Ed.2d 984, 123 S.Ct. 1994] (Chavez) and Spielbauer v. County of Santa Clara (2009) 45 Cal.4th 704, 727 [88 Cal.Rptr.3d 590, 199 P.3d 1125] (Spielbauer), the dissent also contends that writ review is unnecessary because "the mere disclosure of [Maldonado's] statements (as opposed to their use at trial) does not violate Maldonado's constitutional privilege against self-incrimination." (Dis. opn., post, at pp. 783, 787.) The dissent further contends that, in the event the trial court subsequently determines any of Maldonado's statements in the examination exceed the scope of his waiver of the privilege, Maldonado's constitutional rights will be sufficiently protected by the prohibition against derivative use of such statements. (Dis. opn., post, at p. 783.) Whether use immunity alone is a sufficient safeguard in the context of compelled disclosure of potentially incriminating information depends, among other things, on the balance between the defendant's right and competing concerns of the truth-ascertaining adversarial processes of trial in the particular circumstances. (See Centeno, supra, 117 Cal.App.4th at pp. 36, 41-46 [issuing writ directing trial court to rule on relevance of psychiatric tests before requiring defendant to submit to the tests despite immunity against improper use of test results at trial].)
(4) As we discuss in detail post, even though the Fifth Amendment expressly addresses only compulsion "to be a witness against himself" at a criminal trial, the United States Supreme Court has repeatedly fashioned prophylactic rules designed to ensure that the constitutional guarantees are respected in the first instance. (Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda); Kastigar v. United States (1972) 406 U.S. 441, 453 [32 L.Ed.2d 212, 92 S.Ct. 1653] (Kastigar).) The constitutional protection is not limited to direct or derivative use of the statements at trial.
(5) "The need for the availability of the prerogative writs in discovery cases where an order of the trial court granting discovery allegedly violates a privilege of the party against whom discovery is granted, is obvious. The person seeking to exercise the privilege must either succumb to the court's order and disclose the privileged information, or subject himself to a charge of contempt for his refusal to obey the court's order pending appeal. The first of these alternatives is hardly an adequate remedy and could lead to disruption of a confidential relationship. The second is clearly inadequate as it would involve the possibility of a jail sentence and additional delay in the principal litigation during review of the contempt order." (Roberts, supra, 9 Cal.3d at p. 336.)
*757 The dissent argues the Roberts rationale does not support writ review here because "[a]t this point . . . Maldonado has not made any statement subject to any privilege, and the trial court has not decided whether any statement by Maldonado is or will be outside the scope of his waiver. [Citation.]" (Dis. opn., post, at p. 783.) The gravamen of Maldonado's writ petition, however, is that his constitutional privileges will be violated by the immediate disclosure of his statements during the examination pursuant to the trial court order (which allows the prosecution to monitor the examination in real time) before any waiver has occurred (i.e., by Maldonado's introduction of psychiatric evidence at trial) and before the court determines whether his statements during the examination are outside the scope of any waiver. Given the subject matter of the examination (Maldonado's mental state at the time of the crime) and the absence of counsel during the anticipated examination, there is a not insignificant possibility that statements may be elicited that both incriminate Maldonado and fall outside the scope of his waiver.
(6) In sum, we follow the well-established practice of granting writ review of discovery orders that allegedly violate an established privilege.

B. Compelled Psychiatric Examinations[9]of Criminal Defendants

(7) The prosecution cannot constitutionally use the results[10] of a court-ordered psychiatric examination of a defendant at trial unless the defendant has put his mental condition in issue at the trial and has a meaningful opportunity to consult with his counsel before deciding whether to submit to the examination. (Estelle v. Smith, supra, 451 U.S. at pp. 462-473 (Smith); Buchanan v. Kentucky, supra, 483 U.S. at pp. 421-425 (Buchanan); Spencer, supra, 63 Cal.2d at pp. 409-413 [right to assistance of counsel]; People v. Arcega (1982) 32 Cal.3d 504, 522-523 [186 Cal.Rptr. 94, 651 P.2d 338] [right against self-incrimination].) Use of the results of such an examination violates the Fifth Amendment right against self-incrimination because the defendant's statements to the examiner were compelled, incriminating, testimonial, and personal to the defendant. (Smith, at pp. 464-469; see Izazaga, supra, 54 Cal.3d at p. 366; cf. Buchanan, at pp. 422-424 [no 5th Amend. violation where defendant requested the psychiatric examination and tendered the issue of his mental condition at trial].) Use of such statements violates the *758 Sixth Amendment right to counsel (at least where the examination occurs after the initiation of adversary proceedings) because the defendant is entitled to the assistance of informed counsel (i.e., informed of the scope and nature of the examination and the uses to which it might be put) in deciding whether to submit to the examination. (Smith, at pp. 470-471; cf. Buchanan, at pp. 424-425 [no 6th Amend. violation where defense counsel requested examination, knowing the results could be used against the defendant if he put his mental condition in issue at trial].)
(8) When a defendant presents psychiatric evidence on his mental condition at trial, however, he has no Fifth Amendment privilege against prosecution rebuttal psychiatric evidence on that issue, even if based on defendant's own self-incriminating statements. (Buchanan, supra, 483 U.S. at pp. 422-423.) Were the rule otherwise, the defendant's silence might "`deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case'" (id. at p. 422, quoting Smith, supra, 451 U.S. at p. 465), and defendants "could, with impunity, present mental defenses . . ., secure in the assurance they could not be rebutted by expert testimony based on an actual psychiatric examination. Obviously, this would permit and, indeed, encourage spurious mental illness defenses" (People v. McPeters (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834, 832 P.2d 146] (McPeters) [citing Buchanan, supra, 483 U.S. 402], overruled on other grounds in Verdin, supra, 43 Cal.4th at p. 1116). Similarly, a defendant's Sixth Amendment rights are protected if he has the opportunity to consult with counsel before submitting to a psychiatric examination and counsel knows at that time that the results of the examination might be used against the defendant if he raises his mental condition as an issue at trial. (Buchanan, supra, 483 U.S. at pp. 424-425; Spencer, supra, 63 Cal.2d at p. 412.)
(9) The California Supreme Court has further held that defense counsel may be excluded from a compelled psychiatric examination without violating the Sixth Amendment right to counsel if safeguards are observed: "Before submitting to an examination by court-appointed psychiatrists a defendant must be represented by counsel or intelligently and knowingly have waived that right. Defendant's counsel must be informed as to the appointment of such psychiatrists. [Citation.] If, after submitting to an examination, a defendant does not specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should not be permitted to testify at the guilt trial. If defendant does specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should be permitted to testify at the guilt trial, but the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of *759 showing the information upon which the psychiatrist based his opinion." (Spencer, supra, 63 Cal.2d at p. 412, fn. omitted.)
(10) Prior to the effective date of Proposition 115,[11] which introduced reciprocal criminal discovery in this state, California courts held that a defendant who tenders his mental condition at trial can lawfully be compelled under state and federal law to submit to a psychiatric examination by a prosecution expert for purposes of obtaining rebuttal evidence. (McPeters, supra, 2 Cal.4th at p. 1190, citing Buchanan, supra, 483 U.S. 402; see also People v. Danis (1973) 31 Cal.App.3d 782, 786 [107 Cal.Rptr. 675] [psychiatrist appointed by court on prosecutor's motion].) After the passage of Proposition 115, however, the Supreme Court ruled that criminal discovery was limited by statute and no statute then on the books authorized a compelled psychiatric examination of a defendant by a prosecution expert. (Verdin, supra, 43 Cal.4th at pp. 1106-1114.)[12] In response to Verdin, the Legislature recently amended the criminal discovery statutes to provide: "Unless otherwise specifically addressed by an existing provision of law, whenever a defendant in a criminal action . . . places in issue his or her mental state at any phase of the criminal action . . . through the proposed testimony of any mental health expert, upon timely request by the prosecution, the court may order that the defendant . . . submit to examination by a prosecution-retained mental health expert." (§ 1054.3, subd. (b)(1).)[13] That amendment took effect on January 1, 2010.
*760 The trial court's authority to order Maldonado to submit to a psychiatric examination is not contested in this writ proceeding. We assume here the validity of that order. It is clear, and Maldonado does not dispute, that the prosecution may use the results of the examinations in rebuttal to his trial evidence of his mental condition. The questions we consider are (1) when, and under what circumstances, are the examination results to be disclosed to the prosecution, and (2) whether the prosecution may properly have any role in the selection of court-appointed experts to conduct the examinations.

C. Timing and Content of Prosecution Discovery

Maldonado argues that, in order to preserve his Fifth Amendment right against self-incrimination, the results of his compelled examinations should not be disclosed to the prosecution at all unless and until he actually waives those rights by introduction at trial of psychiatric evidence on his mental condition.[14] He further argues that his Sixth Amendment right to counsel cannot be adequately safeguarded unless he knows, before he decides whether or not to submit to the examination, that the results of the examinations will be revealed to the prosecutor only if he ultimately makes the choice to tender the issue of his mental condition at trial.
The prosecutor argued in the trial court that he required the information before trial in order to adequately frame the issues for the jury. He also contended that, in the particular circumstances of the case, there was little risk that Maldonado would make statements during the examination that had not already been disclosed to the prosecution. The trial court concurred "given the very specific facts of this case." The court permitted the prosecution and its agents to remotely observe the examination in real time on the same terms as the defense, stating that "in fairness, if I'm allowing the defense expert and [defense counsel] to be present during this I don't think it's appropriate to limit the People's ability to have people present as long as *761 they are present through the realtime monitor process." The court added, "If [the prosecution is] going to get the reports anyway, which you're entitled to under reciprocal discovery, then it doesn't make much sense to preclude you from attending the actual interview." The court also reasoned that, given that the prosecution had already received petitioner's statements to the police, his statements to defense experts, and the defense experts' reports, the prosecution did not obtain any tactical advantage from being present at the examinations. In granting immediate and concurrent disclosure of the examination results to both the defense and the prosecution, the court concurred with the prosecutor's observations that "in this particular case there has been such a lengthy history with this defendant of saying what he is going to say, and as I say the details vary hugely, but his main story is the same, that the other fellow did it and he was simply there or came later or came sooner or didn't know about it or did know about it. That in this particular case the order is unnecessary and the issue has in fact been waived by the defense for a very good reason, that it's really not anything that's going to make any difference under the peculiar facts of this case. So that's my position. But in the abstract perhaps there might be a time to enter an order protecting his actual statements about the crime, but under the facts of this case such an order is unnecessary, moot and waived."
We conclude that the trial court erred in permitting the prosecution to contemporaneously observe the examinations over defense objection, and that the record before us does not support a determination that Fifth Amendment issues arising from Maldonado's statements about the crime are necessarily "moot," or that he has already "waived" any such claims.
We reject Maldonado's argument that disclosure of examination results must be delayed until he actually presents his own psychiatric evidence at trial (or, alternatively, until the prosecution rests its case-in-chief). In order to preserve the truth-ascertainment function of the trial, the prosecution must have access to the results before trial (subject to a bar against direct or derivative use and after any necessary redaction) so it has adequate time to prepare its rebuttal on the mental health issues. However, a minor delay in pretrial disclosure to allow Maldonado to seek the redaction of allegedly privileged statements before pretrial disclosure to the prosecution is necessary to protect Maldonado's constitutional rights and is minimally prejudicial to the prosecution, which will still have ample time to prepare. We disagree with the People's contention that direct and derivative use immunity alone are necessarily sufficient safeguards of Maldonado's constitutional rights. We therefore hold that disclosure of the complete examination results to the prosecution must be deferred until after Maldonado has had an in camera opportunity to seek redaction of any statements which may be outside the scope of his Fifth Amendment privilege waiver.

*762 1. Pretrial Disclosure of Examination Results

(11) Maldonado argues that no disclosure of examination results should be permitted at all until he actually presents his own psychiatric evidence at trial and thereby explicitly waives his Fifth Amendment right. We conclude that pretrial disclosure of the examination results is necessary to permit the prosecution to prepare its rebuttal case so that it can subject Maldonado's psychiatric evidence to the truth-revealing process of adversarial testing, and to avoid significant midtrial delays in proceedings.
(12) In Williams v. Florida, the United States Supreme Court held that pretrial discovery rules requiring the defendant to "furnish the State with information useful in convicting him" did not violate the defendant's Fifth Amendment right against self-incrimination. (Williams v. Florida (1970) 399 U.S. 78, 82-83 [26 L.Ed.2d 446, 90 S.Ct. 1893] (Williams).) At issue in Williams was a notice-of-alibi rule that required defendants to give pretrial notice if they intended to claim an alibi, to identify the place they claimed to be at the time of the charged crime, and to provide the names and addresses of alibi witnesses they intended to call. (Id. at p. 79.) The court first explained that defendants affected by the rule are not "compelled" to disclose this information because the obligation arises only if they choose to present an alibi defense. Whenever a defendant presents witnesses, the court explained, "he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to incriminating rebuttal evidence. That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination." (Id. at pp. 83-84.) This reasoning, of course, applies equally to a defendant who is compelled to undergo a prosecution psychiatric examination once he chooses to present psychiatric evidence of his own on his mental condition at trial. Maldonado has given notice of his intent to do so.
Regarding the timing of the disclosure, the Williams court explained that the pretrial discovery rule "in no way affected [the defendant's] crucial decision to call alibi witnesses or added to the legitimate pressures leading to that course of action. At most, the rule only compelled [him] to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that [he] from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself." (Williams, supra, 399 U.S. at p. 85.) The court further observed that *763 "[n]othing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice." (Id. at p. 84, fn. omitted.)
In Izazaga, supra, 54 Cal.3d 356, the California Supreme Court upheld the constitutionality of section 1054.3's pretrial disclosure requirement that defendants reveal the names and addresses of all witnesses defendants intend to call at trial. (Izazaga, at pp. 365-367.) Citing Williams, supra, 399 U.S. 78, the court held the rule merely accelerated the timing of a disclosure the defendants planned to make in any event and thus did not compel disclosure in violation of the Fifth Amendment. (Izazaga, at pp. 366-367.)
The court also upheld the statutory discovery rules against a Sixth Amendment challenge. The court cited United States v. Nobles, in which the United States Supreme Court held a defendant could be ordered to turn over a defense investigator's notes if the defendant called the investigator as a witness. (United States v. Nobles (1975) 422 U.S. 225, 240-241 [45 L.Ed.2d 141, 95 S.Ct. 2160] (Nobles).) Izazaga explains: "In Nobles the court stated, `The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.' ([Nobles,] at p. 241 . . . .) Prosecutorial discovery of the statements of intended defense witnesses is a `legitimate demand' of the criminal justice system aimed at avoiding testimonial `half-truths' by promoting what then-Justice Traynor referred to as `the orderly ascertainment of the truth.' (Jones [v. Superior Court (1962)] 58 Cal.2d 56, 60 [22 Cal.Rptr. 879, 372 P.2d 919].)" (Izazaga, supra, 54 Cal.3d at p. 379.) The California Supreme Court rejected the argument that these principles did not apply to pretrial discovery, as distinct from discovery during trial (at or just before the time the defendant actually presents the witness). "The limited and conditional discovery authorized by the new discovery chapter is constitutionally acceptable under the reasoning of Nobles, supra, 422 U.S. 225, regardless of the timing of the discovery." (Id. at p. 380.)
Two California Court of Appeal decisions support application of these principles to pretrial disclosure of the results of a court-ordered psychiatric examination, even though such results may include direct statements by the defendant himself (a factor not present in Williams, supra, 399 U.S. 78, Nobles, supra, 422 U.S. 225, and Izazaga, supra, 54 Cal.3d 356).[15] In *764 Centeno, the defendant raised the issue of his mental retardation as a bar to imposition of the death penalty, and the court ordered him to submit to a psychiatric examination by a prosecution expert. (Centeno, supra, 117 Cal.App.4th at pp. 35-36, disapproved on other grounds in Verdin, supra, 43 Cal.4th at p. 1105.) The court rejected the defendant's argument that examination should be delayed until the defendant presented his own psychiatric evidence at the mental retardation hearing. (Centeno, at p. 40.) "A midhearing postponement of proceedings in order to permit testing and examination of defendant by a prosecution expert would be extremely inefficient, induce unwarranted delay in the proceedings, be unfair to the prosecution, and serve no legitimate interest of defendant." (Ibid.) In Woods, the court held a defendant who announces an intent to raise a mental defense at trial may be required to disclose the test results of his experts before trial, even though they include the defendant's statements. (Woods, supra, 25 Cal.App.4th 178, 181-182, 186.) "A defendant who is required to make a pretrial disclosure of the alibi witnesses he intends to call at trial [as in Williams, supra, 399 U.S. 78,] is for all practical purposes in the same shoes as one presenting a mental defense who must turn over his expert's test results before trial: nothing requires the defendant to rely on the defense; no different pressures distinguish the pretrial decision to use the defense from those that are brought to bear at trial; and nothing penalizes the defendant if he abandons the defense at trial." (Id. at p. 187.) While the court "sympathize[d]" with the defendant's argument that "the vice of acceleration is that disclosure must be made solely to preserve the option of calling the witness (§ 1054.5) even though not all reasonably anticipated witnesses are actually called to the stand," the court held that pretrial disclosure was justified to further "the statutory objectives of ascertaining the truth, saving time in trial, avoiding the necessity of postponements and protecting against undue delay. (§ 1054, subds. (a), (c), (d).) This is especially true in cases of `psychological character evidence' . . . . [Citations.] `No precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior.' [Citation.] When delving into such murky, subjective and debatable diagnostic processes, more akin to `a learned professional art, rather than the purported exact "science" with which Kelly/Frye is concerned' [citation], the greater the pretrial access to the underlying data, the less chance there is for the `eleventh hour defense,' guesswork at trial, incomplete cross-examination or delay to conduct the necessary discovery." (Id. at pp. 187-188.)
(13) We agree. The only meaningful way to rebut a defendant's anticipated psychiatric evidence on his own mental condition is to subject the defendant to a psychiatric examination by independent or prosecution experts, and the only way to subject the defense evidence to meaningful adversarial testing is to provide the results of the examinations before trial so the prosecution has an adequate opportunity to prepare for trial.
*765 Maldonado refers us to rule 12.2 of the Federal Rules of Criminal Procedure (18 U.S.C.) and a case applying that rule (U.S. v. Johnson (N.D. Iowa 2005) 362 F.Supp.2d 1043), which require that the results of a court-ordered examination be kept under seal unless and until the defendant introduces his own psychiatric evidence at trial. This sealing requirement, however, only applies in capital cases and only when the defendant intends to introduce psychiatric evidence on the issue of penalty rather than guilt. (Fed. Rules Crim.Proc., rule 12.2(c)(2), 18 U.S.C.) In those circumstances, the results of the examination are kept under seal unless and until the jury returns a verdict of guilty and the defendant reaffirms his intent to introduce psychiatric evidence at the penalty trial. (Ibid.) The sealing procedure was adopted by several federal district courts even before it was mandated by the rule, and in those cases was justified as necessary to protect the defendant's constitutional rights, apparently by ensuring that the statements were not misused by the prosecution during the guilt phase of the trial in violation of a bar on their use or derivative use. (See U.S. v. Beckford (E.D.Va. 1997) 962 F.Supp. 748, 763-764 & fn. 17; U.S. v. Edelin (D.D.C. 2001) 134 F.Supp.2d 45, 55-56; see also U.S. v. Vest (W.D.Mo. 1995) 905 F.Supp. 651, 653-654; U.S. v. Haworth (D.N.M. 1996) 942 F.Supp. 1406, 1408-1409; U.S. v. Minerd (W.D.Pa. 2002) 197 F.Supp.2d 272, 276; but see U.S. v. Hall (5th Cir. 1998) 152 F.3d 381, 399-400 (Hall) [holding defense opportunity to demonstrate misuse of examination results offers sufficient protection]; U.S. v. Allen (8th Cir. 2001) 247 F.3d 741, 774-775 [same], judg. vacated and cause remended on different grounds sub nom. Allen v. United States (2002) 536 U.S. 953 [153 L.Ed.2d 830, 122 S.Ct. 2653].) The California Supreme Court has similarly endorsed the delayed disclosure of defense penalty phase evidence in a capital case until after conclusion of the guilt phase. (People v. Superior Court (Mitchell) (1993) 5 Cal.4th 1229, 1237-1239 [23 Cal.Rptr.2d 403, 859 P.2d 102] (Mitchell).)
In all of these cases, however, the results of the examination were ordered released to the prosecution before the start of the penalty phase, even though the defendant would not formally waive his Fifth Amendment rights as to the statements unless and until he actually presented psychiatric evidence of his own during that phase of the trial. That is, these courts allowed pretrial disclosure of the results of the examination before the start of the trial in which the defendant intended to present his own psychiatric evidence, a procedure analogous to pretrial disclosure in this case. As the Fifth Circuit has acknowledged, the risk of misuse was still present: "Given that the government presents its case-in-chief during the guilt phase prior to the defendant, we perceive no functional distinction between the risk that the government will improperly utilize the fruits of a psychiatric examination undertaken pursuant to Rule 12.2 during its case-in-chief (and thus prior to the defendant's offering psychiatric evidence of insanity) and the risk that the *766 government in this case would improperly utilize the fruits of the court-ordered psychiatric examination prior to Hall's introduction of psychiatric evidence during the penalty phase." (Hall, supra, 152 F.3d at p. 400, fn. omitted.)
Maldonado has cited no case delaying disclosure of a court-ordered psychiatric examination over the prosecution's objection until the defendant actually presented his own psychiatric evidence at trial. To the extent that petitioner asks us to impose a prophylactic rule mandating delayed disclosure, we decline to do so. We conclude such a delay is not constitutionally mandated, would be judicially inefficient, and would interfere with the truth-seeking mechanism of the trial.

2. Prophylactic Protection of Constitutional Guarantees

Maldonado asked the trial court to bar the prosecution and its agents from access to the results of the examinations until the court conducts an in camera review of the materials. Although Maldonado does not propose substantive standards for the trial court's in camera review of the material, his implication is that some information he may disclose during the examinations should not be provided to the prosecution at all, even if he does present his own psychiatric evidence at trial. In denying petitioner's requests the trial court concluded that "given the very specific facts of this case," i.e., the prosecution having already received Maldonado's statements to the police and to the defense experts, "it's not necessary to engage in any protective measures that [defense counsel] has asserted are appropriate." Recognizing that the trial court presumably has familiarity with the facts of the case that we do not share, we nevertheless do not believe that a blanket prospective determination can be made.
While it may ultimately prove to be the case that all statements made by Maldonado in the course of the examinations are subject to disclosure, the scope of his waiver of the Fifth Amendment privilege is not unlimited. The court cannot abdicate its responsibility to rule on particularized privilege objections on the assumption that Maldonado had already made all of the self-incriminating disclosures he would make in the case.

a. Statements Outside the Scope of Privilege Waiver

(14) Although a defendant waives his Fifth Amendment right against self-incrimination by voluntarily providing testimony in his own defense, he does so only on the issues covered by his affirmative evidence. "[T]he breadth of his waiver is determined by the scope of relevant cross-examination." (Brown v. United States (1958) 356 U.S. 148, 154-155 *767 [2 L.Ed.2d 589, 78 S.Ct. 622]; see also id. at p. 155 [the defendant "determines the area of disclosure and therefore of inquiry"]; People v. Loker (2008) 44 Cal.4th 691, 709 [80 Cal.Rptr.3d 630, 188 P.3d 580] ["scope of proper rebuttal is determined by the breadth and generality of the direct evidence"; "we have firmly rejected the notion that `any evidence introduced by defendant of his "good character" will open the door to any and all "bad character" evidence the prosecution can dredge up'" in penalty phase of capital trial].)
In Powell v. Texas, the court applied this principle to the context of a court-ordered psychiatric examination conducted to rebut psychiatric evidence the defense planned to present at trial. (Powell v. Texas (1989) 492 U.S. 680, 685, fn. 3 [106 L.Ed.2d 551, 109 S.Ct. 3146].) The court held that a capital defendant's introduction of psychiatric evidence on the issue of sanity did not open the door to the admission of psychiatric evidence on future dangerousness at the penalty phase. (Ibid. [finding violation of 6th Amend. right to counsel where defense attorney was not on notice that psychiatric examination of defendant would cover issue of future dangerousness].) In People v. Williams, this court similarly held that a defendant's statements during a court-ordered psychiatric examination on the issue of his defense of insanity could not be used against him in the guilt phase because the defendant "did not put his mental state in issue at the guilt phase." (People v. Williams, supra, 197 Cal.App.3d at p. 1324; see also People v. Jantz (2006) 137 Cal.App.4th 1283, 1295 [40 Cal.Rptr.3d 875] ["a defendant waives the privilege against self-incrimination and the right to counsel regarding expert testimony in sanity trials to the extent necessary to permit useful sanity examinations by defense and prosecution mental health experts"].)
(15) A more difficult issue is defining the extent of the privilege waiver on the specific issues raised by the asserted defense. If a defense expert testifies to an opinion that is based in part on statements made by the defendant, the defense can be compelled to disclose those statements to the prosecution for purposes of cross-examination. (See People v. Jones (2003) 29 Cal.4th 1229, 1263-1264 [131 Cal.Rptr.2d 468, 64 P.3d 762]; People v. Coleman (1989) 48 Cal.3d 112, 151-152 [255 Cal.Rptr. 813, 768 P.2d 32]; People v. Whitmore (1967) 251 Cal.App.2d 359, 366 [59 Cal.Rptr. 411]; see also People v. Mazoros (1977) 76 Cal.App.3d 32, 44-45 [142 Cal.Rptr. 599] [prosecution entitled to review same information defense expert relied on to form his opinion of defendant's mental condition].) But what if prosecution experts assert the need to interview the defendant on matters not previously subjected to inquiry by defense experts in order to form a reliable opinion, or if the defendant conveys additional information regarding the offense (or even other offenses) in responding to questions during the course of the examinations?
*768 Rodriguez v. Superior Court, supra, 14 Cal.App.4th 1260, touched on these issues in discussing the extent of a waiver of attorney-client privilege effected by the presentation of psychiatric evidence in a criminal trial. Pursuant to the reciprocal discovery statute, the defendant gave notice that he intended to call a psychologist as a witness in the guilt phase of his capital trial, and produced a redacted version of the expert's report that deleted his statements about the crime. (Id. at pp. 1263-1264.) The Court of Appeal held that the statements need not be disclosed before the defense expert took the stand because the report "does not demonstrate any reference to or reliance on petitioner's statement regarding the offense. Therefore, nothing contained in the report can be construed as necessitating disclosure of petitioner's statement in order to understand the balance of the report. . . . [¶] . . . [W]e do not conclude that revelation of a patient's mental health history or the results of diagnostic testing necessarily incorporate directly or inferentially petitioner's statements regarding the crime." (Id. at p. 1270.) The court noted that once the defense expert testified it might become apparent that the withheld statements were relevant to his opinion, at which time the court could compel their disclosure. (Id. at p. 1269, fn. 5; see also Andrade v. Superior Court (1996) 46 Cal.App.4th 1609, 1611-1614 [54 Cal.Rptr.2d 504] [following Rodriguez v. Superior Court].)
The approach taken in Rodriguez finds support in decisions from other jurisdictions. That is, other courts have rejected the conclusion that the presentation of defense psychiatric testimony automatically effects a waiver as to all of the defendant's statements in the defense examination or necessarily opens the door to unlimited questioning by prosecution experts on the issue raised by the defense psychiatric evidence.
In Traywicks v. State, for example, the Court of Criminal Appeals of Oklahoma held that a defendant who raised mental defect and alcoholism as a defense to guilt did not have to answer questions about the charged crime during a court-ordered examination on his mental condition, where the defendant had not testified about the crime or talked about the crime with the defense examiner. (Traywicks v. State (1996) 1996 OKCR 54 [927 P.2d 1062, 1063-1064].) In these circumstances, the court held, the defendant "did not waive his right to silence as to the facts of the crime itself." (Id., 927 P.2d at p. 1064 [finding 5th Amend. violation where prosecution expert was allowed to testify about the defendant's refusal to answer questions about the crime].) The Oregon Supreme Court has similarly held that a defendant cannot be required to answer questions pertaining to his conduct during commission of the charged crime in a court-ordered psychiatric examination, but has left open the question of whether he could be compelled to testify about his thoughts during the commission of the crime. (Shepard v. Bowe (1968) 250 *769 Ore. 288 [442 P.2d 238, 240-241]; State ex rel. Johnson v. Richardson (1976) 276 Ore. 325 [555 P.2d 202, 204-205]; State v. Petersen (2009) 347 Ore. 199 [218 P.3d 892, 895].)
The Supreme Court of New Jersey takes a case-specific approach. If a defendant intends to offer psychiatric evidence on his sanity or other mental condition relevant to his guilt of the charged offenses, the following rules apply: "If a defendant stands mute at the [court-ordered] examination or cooperates except for a refusal to discuss the alleged criminal event, at the trial his own psychiatrists will not be permitted over the State's objection to testify to the history of the event given to them. See State v. Whitlow [(1965)] 45 N.J. [3,] 25, 26, 210 A.2d 763. Further, if, as is generally the case, defendant's psychiatrists required the history in order to form an opinion as to insanity [or other mental condition], they would be precluded from testifying to that opinion. [¶] . . . [¶]. . . Suppose defendant's psychiatrists testify that ordinary questioning plus a physical examination were sufficient and that they did not need his account of the alleged criminal event in order to reach their opinion that he was insane when the victim was killed. In this rare situation the defense psychiatrists should be allowed to testify. But if the State psychiatrists are of the view that an opinion on insanity cannot be formed in the absence of unrestricted discussion with defendant, they should be allowed to testify that defendant's refusal to answer questions about the nature of his participation in the alleged crime prevented them from performing their function. [Citations.] . . . [I]n view of the rule set forth herein limiting the probative force of the doctor's testimony to the issue of mental competency, such facts are some evidence of defendant's mental condition and should be received. [Citation.]" (State v. Obstein (1968) 52 N.J. 516 [247 A.2d 5, 12], overruled on other grounds in State v. Engel (1985) 99 N.J. 453 [493 A.2d 1217, 1228] and State v. Williams (1983) 93 N.J. 39 [459 A.2d 641, 645, 658, fn. 19].) The New Jersey court clearly indicated that, as a general matter, an expert needs to question a defendant about the charged offense in order to form an opinion about the defendant's mental condition at the time of the offense. (Obstein, supra, 247 A.2d at pp. 12-13.)
A thorough discussion of the issue appears in U.S. v. Johnson, a federal district court opinion that reviews the Oklahoma, Oregon and New Jersey cases mentioned above. (U.S. v. Johnson (N.D. Iowa 2005) 383 F.Supp.2d 1145, 1154-1158 (Johnson).)[16] The court held that when the defendant offers psychiatric evidence on a mitigating factor that can only meaningfully be *770 evaluated in relation to the defendant's thinking or conduct at the time of the offense, "the defendant's waiver of the Fifth Amendment right against self-incrimination necessarily includes a waiver of the right to refuse to answer offense-specific questions. [Citation.]" (383 F.Supp.2d at p. 1161.) When the evidence relates to a postoffense mental condition or a long-standing mental condition that may have no specific impact on the thinking or conduct of the defendant at the time of the offense, on the other hand, the court must "determine the need that defense or government experts have for offense-specific questions, before the government's experts are allowed to ask offense-specific questions, the defendant is required to answer such questions, or the prosecution is allowed to use the defendant's responses to rebut her mental condition [evidence]." (Id. at p. 1162.) "If the defendant discussed offense-specific information with her own experts, and her experts present such evidence, but she refuses to discuss such information with the prosecution's experts, the defendant should either be compelled to answer the prosecution's experts' questions or her mental condition defense, if not stricken in its entirety, should be impeached with her failure to answer the government's experts' questions. [Citations.]" (Id. at p. 1163.)
(16) In recognizing the possibility that some of Maldonado's statements in the context of a compelled examination may still be subject to a claim of privilege, we do not attempt to delineate the permissible scope of questioning by the court-ordered experts.[17] We agree with Obstein and Johnson, however, that the permissible scope of disclosure of information revealed in the course of compelled examinations will depend on (1) the scope of inquiry by the defendant's psychiatric examiners, and (2) whether inquiry by the appointed experts, if beyond the scope of the defense examination, is nevertheless necessary to render a reliable and informed opinion on the mental condition issue raised by the defendant.

b. Use Limitations of Petitioner's Statements

The People argue that, because the trial court's order confirms that the prosecution can only make use of the examination results at trial if Maldonado actually presents his own psychiatric evidence, prophylactically barring disclosure of the examination results is not required by the Fifth Amendment. The contention is that there can be no Fifth Amendment violation unless the prosecution "improperly uses a compelled statement against the defendant at trial."
On this point, the People cite United States Supreme Court cases that distinguish between the core constitutional "right"a prohibition against the *771 use of a compelled self-incriminatory statement against a defendant in a criminal caseand prophylactic rules imposed by the court as a means of protecting this core right. In United States v. Verdugo-Urquidez, the court drew a distinction between Fourth and Fifth Amendment violations. (United States v. Verdugo-Urquidez (1990) 494 U.S. 259, 264 [108 L.Ed.2d 222, 110 S.Ct. 1056].) The court wrote that in contrast to a violation of the Fourth Amendment guarantee against unreasonable searches and seizures, which occurs when the search and seizure occurs, a violation of the Fifth Amendment guarantee against self-incrimination occurs at the time that a defendant's compelled self-incriminating statements are used against him in a criminal case, rather than at the time that the statements are compelled. (Verdugo-Urquidez, at p. 264.) Similarly, in United States v. Balsys, the court held that no constitutional violation occurred where an individual's self-incriminating statements were compelled within the United States, but the anticipated use of the statements in a criminal trial (implicating the core right of the 5th Amend. self-incrimination clause) would occur outside the United States (and thus would not be covered by the 5th Amend.). (United States v. Balsys (1998) 524 U.S. 666, 671, 691-698 [141 L.Ed.2d 575, 118 S.Ct. 2218].)
In Chavez, the court revisited the distinction between core rights and prophylactic rules in the context of a federal civil rights action. (Chavez, supra, 538 U.S. 760.) A plurality of the court wrote, "Although our cases have permitted the Fifth Amendment's self-incrimination privilege to be asserted in non-criminal cases [citations], that does not alter our conclusion that a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." (Id. at p. 770 (plur. opn. of Thomas, J.).) The nature of the constitutional "right" was dispositive because the federal civil rights statute provides a private civil remedy only for violation of a constitutional right. (Id. at p. 766 (plur. opn. of Thomas, J.); 42 U.S.C. § 1983.) The plurality acknowledged the existence of Fifth Amendment "prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause. [Citations.] Among these rules is an evidentiary privilege that protects witnesses from being forced to give incriminating testimony, even in noncriminal cases, unless that testimony has been immunized from use and derivative use in a future criminal proceeding before it is compelled. See Kastigar, supra, [406 U.S.] at [page] 453 ...; [citation]." (Chavez, at pp. 770-771.) Similarly, the concurring opinion of Justice Souter identified the core right of the self-incrimination clause as courtroom use of a criminal defendant's compelled self-incriminating testimony, but acknowledged "`extensions' of the bare guarantee" in the court's Fifth Amendment holdings of Kastigar and Miranda. (Chavez, at pp. 777-778 (conc. opn. of Souter, J.).) Although the court majority agreed that a damages remedy should not be recognized for *772 violations of the prophylactic rules, nothing in the plurality or concurring opinions suggests that the prophylactic rules lack constitutional force or are less than binding on the lower courts. (See also id. at p. 791 (conc. & dis. opn. of Kennedy, J.) ["the Self-incrimination Clause is a substantive constraint on the conduct of the government, not merely an evidentiary rule governing the work of the courts"]; Dickerson v. United States (2000) 530 U.S. 428, 437-438, 444 [147 L.Ed.2d 405, 120 S.Ct. 2326] [Miranda announced a "constitutional rule" binding on Congress]; People v. Lessie (2010) 47 Cal.4th 1152, 1164 [104 Cal.Rptr.3d 131, 223 P.3d 3] [Miranda and its progeny "continue to bind the state courts"].)
The People note that the California Supreme Court recently cited with approval the distinctions drawn in Chavez in Spielbauer, supra, 45 Cal.4th 704. There the court held that a public employee may not refuse to answer a public employer's job-related questions that elicit potentially incriminating information, which the court noted could not legally be used against him at trial, even if the employee has not been granted express use immunity. (Id. at pp. 709-710.) Rejecting the employee's Fifth Amendment claim, the court wrote that the state and federal guarantees against self-incrimination "do not prohibit officially compelled admissions of wrongdoing as such. They only forbid the criminal use of such statements against the declarant. Constitutionally based prophylactic rules, such as a prior-immunity requirement in some cases, have arisen to protect the core privilege, but the right against self-incrimination is not itself violated until statements obtained by compulsion are used in criminal proceedings against the person from whom the statements were obtained. (Chavez, supra, 538 U.S. 760, 767-773 (plur. opn. of Thomas, J.); see also id. ... at pp. 777-778 (conc. opn. of Souter, J.).)" (45 Cal.4th at p. 727.)
We do not understand the court's opinion in Spielbauer to be inconsistent with our analysis. Like Chavez, Spielbauer expressly acknowledges the validity and binding nature of the established prophylactic rules protecting Fifth Amendment guarantees, such as the rule that an individual may not be compelled to answer incriminating questions even in a civil proceeding absent an express grant of immunity. (Spielbauer, supra, 45 Cal.4th at p. 714.) The court simply identified a limited exception to that rule in the narrow context of the job-related inquiry of a public employer: "The Constitution cannot mean that a public employee may refuse with impunity to account for his or her performance on the public payroll, and may delay the progress of an employer's inquiry, unless and until he or she obtains a formal and legally binding guarantee that any statements obtained by the employer will never be used to prosecute the employee on criminal charges." (Id. at p. 726.)
*773 (17) While there is a recognized distinction between the core right of the self-incrimination clause and prophylactic measures designed to protect that core right, it does not follow that a trial court may ignore a defendant's assertion of the constitutional privilege and summarily deny prophylactic safeguards when properly invoked.

c. Derivative Use

(18) In Kastigar, supra, 406 U.S. at page 453, the United States Supreme Court recognized that a defendant's Fifth Amendment right against self-incrimination can be meaningfully preserved following a compelled disclosure only if both the use and derivative use of the compelled statements in a criminal case are prohibited.[18] Moreover, the prosecution bears the "affirmative duty to prove that evidence it proposes to use [in a criminal case] is derived from a legitimate source wholly independent of the compelled testimony." (406 U.S. at p. 460.) Here, the People concede that the prosecution is not allowed to "use" Maldonado's statements during the court-ordered examinations unless and until Maldonado presents his own psychiatric evidence at trial. Although the People do not explicitly include derivative use in this prohibition, Kastigar compels such a bar and we so construe the People's concession.[19]
Despite this bar on both use and derivative use, courts have acknowledged the risk that prosecutors will misuse compelled statements and the difficulty (despite the prosecution's affirmative burden of proof) of a defendant's establishing misuse. In Garcia, supra, 42 Cal.4th at pages 76-77, the California Supreme Court held that a pretrial Pitchess declaration (Pitchess v. Superior Court (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]), which disclosed defense theories of the case, should be redacted before being disclosed to the city attorney, rather than simply being released under a *774 protective order, because "the city attorney is not an entirely neutral third party." (Cf. Woods, supra, 25 Cal.App.4th at pp. 187-188 [sympathizing with the argument that "the vice of acceleration [(i.e., pretrial discovery)] is that disclosure must be made solely to preserve the option of calling the witness... even though not all reasonably anticipated witnesses are actually called to the stand" (citation omitted)].) In Mitchell, the court found merit in the defendant's argument "that advance disclosure of his intended penalty phase evidence may jeopardize his guilt phase defense, potentially violating his privilege against self-incrimination and infringing on his right to a fair trial." (Mitchell, supra, 5 Cal.4th at p. 1237.) The court held that a trial court could choose to delay disclosure of such evidence in order to safeguard the defendant's rights. (Id. at pp. 1237-1239.)
In U.S. v. Allen, a federal appeals court expressed similar concerns regarding the disclosure of a court-ordered psychiatric examination of a defendant. (U.S. v. Allen, supra, 247 F.3d at p. 773.) The court acknowledged the danger of "impermissible early introduction of the fruits of a government psychiatric examination," but concluded a defendant's constitutional rights were adequately protected "under a scheme wherein the defendant has the burden of producing some evidence of taint, and the government has the ultimate burden of persuading the court that the evidence is not tainted. [Citation.]" (Ibid.; see also U.S. v. Taveras (E.D.N.Y. 2006) 233 F.R.D. 318, 322 [delaying disclosure because of risk of unlawful leaks].) In Allen, however, the district court had allowed one assistant prosecutor to begin evaluating the results of the government's psychiatric examination prior to the sentencing phase only under an order to not divulge any of the results to the rest of the prosecution team until after the completion of the guilt phasea so-called "Chinese wall" procedure, a prophylactic procedure which the appellate court found "legally and constitutionally sufficient." (U.S. v. Allen, supra, at p. 773 & fn. 11.)
Even cases cited by the People acknowledge these risks. (See U.S. v. Stockwell, supra, 743 F.2d at p. 127 [finding no constitutional violation in prosecutor's direct monitoring of a compelled psychiatric examination, but advising against the practice because it "might raise a significant question as to whether [the prosecution] had improperly used information obtained in the psychiatric examination to develop evidence going beyond the issue of insanity"]; Hall, supra, 152 F.3d at p. 399 [acknowledging that sealing the results of a psychiatric examination "advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination," but holding such a measure is not constitutionally required].)
*775 These cases demonstrate that a simple bar against derivative use is not alone a fail-safe protective measure, and that courts may consider and implement other protective measures if required. We do not believe that giving a defendant at least the opportunity to invoke the court's protection at a time when protective measures would still be meaningful "usher[s] in a new era of Fifth Amendment law," as the dissent suggests. (Dis. opn., post, at p. 778.)

3. Protective Measures in This Case

Again, the question is not whether the results of Maldonado's examinations will be disclosed to the prosecution, but when and how that disclosure will take place. Delaying disclosure of the examination results until and unless Maldonado actually introduces his own psychiatric evidence at trial, or even, as Maldonado now suggests, until the close of the prosecution's case-in-chief, would compromise the legitimate interests in "avoiding the necessity of a disrupted trial" (Williams, supra, 399 U.S. at p. 86 [citing this interest and holding defendant can be compelled to disclose alibi before he actually waives privilege by presenting alibi evidence at trial]), "enhanc[ing] the fairness of the adversary system" (Wardius v. Oregon (1973) 412 U.S. 470, 474 [37 L.Ed.2d 82, 93 S.Ct. 2208] [citing this interest and concluding defendant's constitutional rights cannot be infringed by pretrial discovery obligations unless discovery is reciprocal]), protecting the "`integrity of the judicial system and public confidence in the system'" (Nobles, supra, 422 U.S. at pp. 231, 239-240 & fn. 14 [citing this interest and holding defense investigator who testifies about prosecution witness's statements can be required to disclose his notes despite work product privilege]), "get[ting] the full benefit of cross-examination and the truth-finding process" (id. at p. 231 [same]), and adhering to "rules of procedure that govern the orderly presentation of facts and arguments" and allow the adversary system to function (Taylor v. Illinois (1988) 484 U.S. 400, 410-411 [98 L.Ed.2d 798, 108 S.Ct. 646] [citing this interest and holding there is no absolute bar against precluding defense witnesses as discovery sanction despite 6th Amend.]). Postponing disclosure would unreasonably interfere with the prosecution's ability to prepare its cross-examination and rebuttal evidence and would likely require a recess of the trial, thereby burdening jurors and disrupting their receipt and consideration of evidence.
(19) We are not convinced that a minor pretrial delay of disclosure to permit an opportunity for in camera review of the examination results, on the other hand, would create a "daunting" burden for the prosecution or for the court, as our dissenting colleague suggests. (Dis. opn., post, at p. 786.) The trial judge must, in any event, resolve at some point the admissibility of any statements of the defendant the prosecution seeks to introduce, whether *776 for impeachment or otherwise. Use of an in camera procedure in the first instance to ensure that confidential or privileged information is not irrevocably compromised is scarcely terra incognita for an experienced trial judge. (E.g., Evid. Code, §§ 915, subd. (b), 1045, subd. (b) [Pitchess motions[20]]; see also In re Lifschutz (1970) 2 Cal.3d 415, 431, 437, fn. 23 [85 Cal.Rptr. 829, 467 P.2d 557] [trial judge should take necessary precautions to protect unwarranted intrusions into the confidentiality of psychotherapist-patient communications, including routinely permitting such disclosure to be made ex parte in his chambers, even where the patient has placed his mental state in issue].) We can also foresee potentially far greater burdens and disruptions to the trial process should a trial judge, for example, later determine that the prosecution has been privy to constitutionally privileged defense information, and is then required to consider disqualification in order to ensure that the defendant receives a fair trial. (§ 1424; see, e.g., People v. Choi (2000) 80 Cal.App.4th 476 [94 Cal.Rptr.2d 922].)
(20) A necessary corollary of preserving the right to assert disclosure objections is that the prosecution may not observe the examinations in real time. The prosecution will not be prejudiced by such a restriction, because they may not in any event directly participate in the examinations, and since there will be remote video monitoring, and presumably recording, of the sessions. Since the defense will be permitted to contemporaneously observe the examinations, there is no reason that petitioner cannot promptly identify any arguably objectionable material and present those objections to the court within a reasonable time established by the court. Nothing in our discussion suggests that the prosecution may not be immediately provided with at least the diagnostic opinions or conclusions of the appointed experts. Once the court has considered and ruled upon the defense objections, and subject to any redactions that may be required, the prosecution will then be entitled to pretrial access to the balance of the examination results, including any video or audio recordings.
We find that Maldonado's Sixth Amendment objections are obviated or adequately addressed by the ability of the defense to monitor the examinations, and to interpose timely objections to disclosure of statements which Maldonado may make. It is only Fifth Amendment issues which we believe the trial court must then address and resolve if properly raised. We also emphasize that we do not suggest that prophylactic orders prohibiting or restricting prosecution access to petitioner's statements are, or necessarily will be, required. The examinations have not taken place. The extent to which these issues may arise is a matter of speculation. The trial court may, at the end of the day, be correct that further orders are "unnecessary." That determination can only be made, however, after petitioner is given an *777 opportunity to make particularized objection, and the court then exercises its discretion with these considerations in mind.

D. Selection of Experts

(21) Maldonado argues that any involvement of the prosecution in the selection of experts to examine him pursuant to Evidence Code section 730 conflicts with the legislative intent of the statute, which is to appoint disinterested experts to assist the court and jury in making factual determinations. The trial court, in rejecting this objection, explained that the prosecution's assistance in identifying mental health experts who had the necessary language skills to interview Maldonado in Spanish was "not in any way prejudicial to the defendant. It's going to be clear that when I make these appointments they're appointments made by the Court . . . ."
The issue appears, for all practical purposes, to now be moot. Newly amended section 1054.3 is in effect, and the trial court on remand will have the authority to order Maldonado to submit to examination by prosecution-selected experts. We have assumed the court's authority to make appointments under Evidence Code section 730 in these circumstances, but the court may decide to revise its prior order and expressly provide for a prosecution psychiatric examination.
We in any event agree that the prosecution's limited role in identifying qualified bilingual mental health experts for possible appointment by the trial court does not render the examination process biased or adversarial such that it is inconsistent with Evidence Code section 730. Maldonado has not cited any evidence that the experts appointed by the court are in fact biased in favor of the prosecution, nor did he identify alternative experts for the court's consideration. The mere fact that the prosecution assisted the court in identifying candidates for the court's own selection does not call into question the neutrality of the process. The trial court properly denied Maldonado's requests that the prosecution be barred from any involvement in the selection of court-appointed experts.

III. DISPOSITION AND ORDER
The alternative writ is discharged and the petition is granted in part and denied in part consistent with the views expressed in this opinion. A peremptory writ of mandate shall issue directing the trial court to vacate its September 8, 2009 order with respect to requests Nos. 5, 6, 7, 8 and 10 and enter a new order consistent with the views expressed in this opinion. The order shall provide that:
(1) Prosecuting attorneys and their agents shall be barred from observing the examinations of Maldonado in real time. All persons present at the *778 examinations, including the examiners, shall be barred from disclosing any statements made by Maldonado during the course of the examinations until expressly authorized to do so by the trial court.
(2) Within a specified amount of time after the conclusion of each examination (to be determined by the trial court), Maldonado may assert any privilege objections to disclosure of his statements, or any portion thereof, made during the course of the examinations. The motion may be filed under seal and the trial court must conduct an initial in camera review of the motion to determine whether the motion has merit.
(3) In ruling on the motion, the trial court shall determine if Maldonado's statements to the examiners, in whole or in part, remain subject to Fifth Amendment privilege, redact any statements it finds to be privileged, and may then order the balance of the results of the examinations, including any notes and recordings, disclosed to the prosecution. The court must also consider whether disclosure should be conditioned or limited in any fashion in order to preserve any valid assertion of privilege, or to preclude derivative use.
The previously issued stay shall remain in effect until the remittitur issues.
Jones, P. J., concurred.
NEEDHAM, J., Dissenting.
In the matter before us, the prosecutor agreed that evidence obtained from the examinations of Reynaldo A. Maldonado would be used only to the extent Maldonado pursued his neurocognitive defense at trial. Such use would not run afoul of the Fifth Amendment. (E.g., Buchanan v. Kentucky (1987) 483 U.S. 402, 422-424 [97 L.Ed.2d 336, 107 S.Ct. 2906] (Buchanan).) Furthermore, it was never contended that the prosecutor would make derivative use of the evidence, so there was never any danger that the timing and method of disclosing the examination results would violate Maldonado's Fifth Amendment rights either. Indeed, it was clear (at least until this court's decision today) that a guarantee of use immunity and derivative use immunity protects the privilege against self-incrimination, since such immunity by itself "remove[s] the dangers against which the privilege protects." (Kastigar v. United States (1972) 406 U.S. 441, 449 [32 L.Ed.2d 212, 92 S.Ct. 1653] (Kastigar).) To the extent Maldonado could not convince the trial court to impose additional safeguards in its discretion, he has an adequate remedy at law. His petition for extraordinary relief therefore failed to allege circumstances justifying our review, and his petition should have been denied.
The majority opinion, however, embraces Maldonado's petition as an opportunity to usher in a new era of Fifth Amendment law. Eschewing *779 California and federal precedents, it suggests that use and derivative use immunity is no longer good enough. Overlooking petitioner's acknowledgement that a trial court might, in its discretion, properly employ a variety of approaches to adequately protect a defendant's rights, this court strips all trial courts in this state of discretion to tailor Fifth Amendment protections to the circumstances of the case, and forces them instead to don a one-size-fits-all procedure that will likely fit very few. I respectfully but strongly dissent.

A. Background

Plainly stated, Maldonado is seeking a writ of mandate directing the trial court to grant his motion for a protective order in a discovery dispute. His motion did not challenge the prosecution's right to compel his neurological, psychiatric, and psychological examination by court-appointed experts. Nor did his motion urge that he be granted use immunity and derivative use immunity for his statements, because his entitlement to it was never in dispute. Rather, Maldonado requested over two dozen limitations on how the examinations should proceed in light of the parties' competing interests and the circumstances of the case, requesting protections above and beyond use and derivative use immunity. As relevant here, Maldonado contends (1) the prosecutor should be barred from attending (from another room) the examination of petitioner by the court-appointed psychologist, psychiatrist and neurologist; (2) the prosecutor should be barred from access to reports, notes, and recordings of the examinations until after the close of the defense case, upon which the trial court would inspect the materials in camera to determine whether production to the prosecutor would violate Maldonado's privilege against self-incrimination; (3) the trial court should wait to decide the admissibility of the evidence until after the in camera inspection and a hearing; (4) the prosecutor should be precluded from contacting the court-appointed experts until after the court's in camera decision; and (5) the court-appointed experts should maintain confidentiality.
While the trial court found that the foregoing additional safeguards were unnecessary under the facts of the case, the majority opinion eviscerates the trial court's exercise of its discretion and modifies the order, precluding the prosecutor from viewing the examination in real time, barring the examiners from disclosing Maldonado's statements until permitted by the court, allowing Maldonado to move, under seal, to bar disclosure of any of his statements, and requiring the trial court to conduct an in camera review and determine if Maldonado's statements remain subject to Fifth Amendment protection. Basing this new "prophylactic" rule on the perceived mandates of the federal Constitution, the majority opinion implies that this burdensome procedure must be used by every court from now on. The majority's undertaking is unwarranted.

*780 B. Adequate Remedy at Law

I begin my analysis with a fundamental principle that has enabled both the trial courts and the appellate courts of this state to function efficiently toward the goal of timely justice: no extraordinary writ shall issue unless the petitioner can demonstrate that he or she lacks any adequate remedy other than the appellate court's immediate intervention in the processes of the trial court.
Writ relief is granted only in the discretion of the appellate court, in extraordinary cases, when compelled by equitable principles. (See generally Omaha Indemnity Co. v. Superior Court (Greinke) (1989) 209 Cal.App.3d 1266, 1271-1274 [258 Cal.Rptr. 66] (Omaha Indemnity).) "`If the rule were otherwise, in every ordinary action a defendant whenever he chose could halt the proceeding in the trial court by applying for a writ . . . to stop the ordinary progress of the action toward a judgment until a reviewing tribunal passed upon an intermediate question that had arisen. If such were the rule, reviewing courts would in innumerable cases be converted from appellate courts to nisi prius tribunals . . .'. . . [and] [¶] . . . [¶] . . . would be trapped in an appellate gridlock." (Id. at pp. 1272-1273, citation omitted.) Furthermore, an error by the trial court might be cured at the trial level, review on a direct appeal from the judgment might provide an adequate remedy, and the case might be settled or otherwise resolved in the interim. (Id. at p. 1273.) "In reality, perhaps the most fundamental reason for denying writ relief is the case is still with the trial court and there is a good likelihood purported error will be either mooted or cured by the time of judgment." (Science Applications Internat. Corp. v. Superior Court (1995) 39 Cal.App.4th 1095, 1100 [46 Cal.Rptr.2d 332].) Indeed, the trial court must remain vested with the discretion necessary to apply the law and fine-tune its rulings in light of the parties' interests and the evolving circumstances of the case, which may change dramatically during the course of a criminal proceeding.
These well-established principles compel the denial of Maldonado's petition. In the first place, Maldonado has not made any particularized showing that the trial court's handling of the parties' discovery dispute has caused or will cause Maldonado any harm. There is, as of this moment, not one incriminating statement Maldonado has uttered that is poised to fall into the hands of the prosecution. Nor does the record suggest any peculiar likelihood that he is going to make a self-incriminating statement that would be outside *781 the scope of his "waiver" of his right against self-incrimination (occasioned by his neurocognitive defense), in response to queries by independent court-appointed examiners regarding his neurocognitive defense.[1]
In addition, even if Maldonado were to make a statement he thinks is constitutionally protected, and the prosecutor heard it, Maldonado could seek an order from the trial court to preclude the prosecutor from using the statement or any derivative evidence at trial. As mentioned, the prosecutor does not dispute that it cannot use any statements Maldonado utters in the examinations except for the limited and express purpose of rebutting the defense Maldonado himself tendered. Given Maldonado's failure to allege any factual circumstance that would suggest otherwise, this procedure in itself adequately protects Maldonado's right against self-incrimination. (See Chavez v. Martinez (2003) 538 U.S. 760, 770-771 [155 L.Ed.2d 984, 123 S.Ct. 1994] (plur. opn. of Thomas, J.) (Chavez); Kastigar, supra, 406 U.S. at p. 462.) Maldonado's petition therefore established he is not constitutionally entitled to the relief he seeks.
Furthermoreas if the foregoing were not enoughMaldonado also has the adequate legal remedy of a direct appeal from any adverse judgment. By direct appeal, he could challenge the trial court's denial of his motion for a protective order, which is the subject of his current petition. He could also challenge any adverse ruling the court might make in deciding whether to preclude the use of statements or derivative evidence at trial. If, indeed, the trial court erred in any of these respects and Maldonado was prejudiced thereby, he would be granted appropriate relief. These matters are best viewed in an appeal after judgment. (See People v. Wallace (2008) 44 Cal.4th 1032, 1087 [81 Cal.Rptr.3d 651, 189 P.3d 911] [in postconviction review, trial court's rulings requiring defendant to submit to psychiatric examination by prosecution expert and admitting testimony about defendant's refusal to cooperate in the examination were held erroneous but not prejudicial].)
To me, the conclusion is inescapable: based on the allegations of his petition, Maldonado fails to establish that he lacks an adequate legal remedy, and his writ petition should have been denied on that ground. Further, I see no good to be gained from sidestepping these principles in order to tinker with the discretionary rulings of the trial court or to pronounce new far-reaching *782 constitutional mandates. Nonetheless, in light of the importance of a defendant's claim that his constitutional rights may be infringed, I will amplify these points in greater detail.

C. The Rarity of Review of Discovery Orders by Extraordinary Writ

My view is really nothing more than what California courts have emphasized for a long time. Writ relief in discovery matters is strongly disfavored because of the inherent likelihood that any purported error may be mooted or cured by the trial court without appellate court intervention, and because of the availability of relief on direct appeal from the judgment.
This is so for good reason. The delay occasioned by interim review of discovery orders is usually worse for the judicial system than the harm caused by the order. (Sav-On Drugs, Inc. v. Superior Court (1975) 15 Cal.3d 1, 5 [123 Cal.Rptr. 283, 538 P.2d 739] (Sav-On).) Further, no matter how tempting it may be for an appellate court to come up with a better exercise of discretion than the trial court, it is not our job to peer over the trial court's shoulder as it handles every procedural nuance of a case, even if it touches upon a constitutional concern. The exceptions to this fundamental principle are few, and none of them apply here.
In criminal proceedings, it has been observed that pretrial discovery orders "may, in certain instances, be reviewed by prohibition or mandate." (People v. Municipal Court (Ahnemann) (1974) 12 Cal.3d 658, 661 [117 Cal.Rptr. 20, 527 P.2d 372], italics added [denying writ review of an order pertaining to admissibility of evidence].) For example, writ review may be appropriate where the defendant has been denied outright a request for discovery. (E.g., Joe Z. v. Superior Court (1970) 3 Cal.3d 797, 800-801 [91 Cal.Rptr. 594, 478 P.2d 26].) This line of cases is inapposite, of course, because the court's order did not bar Maldonado from any discovery, let alone discovery that might lead to a defense against the charges. It merely set forth how and when discovery should best be provided to the prosecution in the context of this particular case, assuming the guarantee of use and derivative use immunity.[2]
*783 In the civil context as well, an appellate court rarely interjects itself into the trial court proceedings for the purpose of reviewing a discovery ruling. "[T]he prerogative writs should only be used in discovery matters to review questions of first impression that are of general importance to the trial courts and to the profession, and where general guidelines can be laid down for future cases." (Oceanside Union School Dist. v. Superior Court (1962) 58 Cal.2d 180, 185-186, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439].) Here, Maldonado's petition substantially retreads old ground as to the ability of the prosecution to obtain discovery with respect to a defendant's psychiatric defense, and the sufficiency of use and derivative use immunity to protect the right against self-incrimination. To the extent the procedural context in the case brings something new, it does not raise a question of general importance to the trial courts or the profession, but instead involves a narrow issue arising only in criminal cases in which a defendant has tendered a mental defense and the prosecution has sought an examination of the defendant under Evidence Code section 730. Moreover, no general guideline can or should be laid down for future cases, because the appropriate means of protecting the defendant's right against self-incrimination is best resolved on a case-by-case basis by the trial court, for reasons discussed post.
In both criminal and civil cases, writ review of discovery orders may be appropriate if the order compels discovery of information that is privileged from disclosure. (See, e.g., Sav-On, supra, 15 Cal.3d at p. 5.) At this point, however, Maldonado has not made any statement subject to any privilege, and the trial court has not decided whether any statement by Maldonado is or will be outside the scope of his waiver. (See Warford v. Medeiros (1984) 160 Cal.App.3d 1035, 1043-1045 [207 Cal.Rptr. 94] [claim of privilege against self-incrimination must identify a particular question that would reasonably lead to a self-incriminating answer] (Warford).) Furthermore, although Maldonado says the trial court's order could lead to the disclosure of statements possibly protected by the privilege against self-incrimination, the mere disclosure of those statements (as opposed to their use at trial) does not violate Maldonado's constitutional privilege against self-incrimination. (Chavez, supra, 538 U.S. at pp. 767-773 (plur. opn. of Thomas, J.); Spielbauer v. County of Santa Clara (2009) 45 Cal.4th 704, 727 [88 Cal.Rptr.3d 590, 199 P.3d 1125] (Spielbauer).) Unlike the attorney-client privilege, where the very fact of disclosure destroys the right protected by the privilege, the mere disclosure of any incriminating statements by Maldonado will not destroy the constitutional right protected by the privilege against self-incrimination, particularly when disclosure is made with the understanding that those statements cannot be used in a criminal trial. (See Fuller v. *784 Superior Court (2001) 87 Cal.App.4th 299, 308-310 [104 Cal.Rptr.2d 525] (Fuller).)[3] There is no imminent need for us to interfere in Maldonado's case.[4]
There are, of course, instances in which it is necessary to review orders violating the privilege against self-incrimination, but this is not one of them. In the first place, Maldonado's petition did not make a threshold showing that the order violates his Fifth Amendment rights. The Fifth Amendment does not preclude the prosecution from obtaining psychiatric evidence for rebuttal purposes, since Maldonado placed his mental condition at issue. (Buchanan, supra, 483 U.S. at pp. 423-424.) While he argued that his Fifth Amendment waiver does not arise until he presents psychiatric evidence at trial, the notion is contrary to federal precedent (see discussion of U.S. v. Stockwell (2d Cir. 1984) 743 F.2d 123, post) and immaterial in light of use and derivative use immunity.
Furthermore, the cases cited by the majority opinion in regard to review of Fifth Amendment issues do not apply here. In large part the majority opinion relies on cases affording writ review whereunlike hereit was not already agreed that the defendant would have use and derivative use immunity under the Fifth Amendment for his statements, and the need to protect the defendant's constitutional rights was therefore at stake. Those cases are plainly distinguishable.
The remaining Fifth Amendment cases cited by the majority opinion demonstrate precisely why writ review is not appropriate here, because they *785 confirm that use and derivative use immunity is in itself sufficient to protect Fifth Amendment rights. (Baqleh v. Superior Court (2002) 100 Cal.App.4th 478, 501-503 [122 Cal.Rptr.2d 673] [accused cannot invoke 5th Amend. to refuse to submit to a mental examination by a prosecution expert in connection with a Pen. Code, § 1368 hearing, in light of the judicial rule of immunity that, like use and derivative use immunity, adequately protects his 5th Amend. rights]; People v. Superior Court (Kaufman) (1974) 12 Cal.3d 421, 427-429, 433 [115 Cal.Rptr. 812, 525 P.2d 716] [trial court may compel a witness to answer questions in deposition and at trial, over the witness's assertion of the 5th Amend. privilege against self-incrimination, by granting the witness immunity against the use of the deposition answers in any criminal proceeding]; Fuller, supra, 87 Cal.App.4th at pp. 308-311 [trial court may fashion an order that "accommodates all of the competing interests" once a witness invokes the right against self-incrimination, which might include granting immunity to the defendant and compelling discovery]; Gonzales v. Superior Court (1980) 117 Cal.App.3d 57, 69-72 [178 Cal.Rptr. 358] [district attorney's renewed motion to compel petitioners to answer interrogatories should be granted on condition that there be a protective order insulating petitioners from use of the information and its fruits in connection with any criminal prosecution against them]; People v. Superior Court (Taylor) (1975) 53 Cal.App.3d 996, 998, 1001 [126 Cal.Rptr. 297] [record did not disclose any basis for trial court refusing People's request to compel discovery from defendant upon granting defendant immunity].) While it might have been necessary in these earlier cases to explore the sufficiency of use and derivative use immunity, that does not mean we must entertain Maldonado's petition in order to rehash the point. Cases that prove Maldonado is wrong on the merits should not entitle him to extraordinary writ review.
Next, I consider the cases in which appellate courts have indulged in writ review where a discovery order deprived a party of a fair opportunity to litigate a case or "the damage done by improperly allowing such discovery cannot readily be cured after it has occurred." (Spectra-Physics, Inc. v. Superior Court (1988) 198 Cal.App.3d 1487, 1493 [244 Cal.Rptr. 258]; e.g., Waicis v. Superior Court (1990) 226 Cal.App.3d 283, 286-287 [276 Cal.Rptr. 45]; Brown v. Superior Court (1949) 34 Cal.2d 559, 562 [212 P.2d 878].) Here, permitting the prosecutor to hear Maldonado's statements to the court-appointed experts, even if erroneous, would not deprive Maldonado of a defense, witness, or evidence. Nor would it put the prosecution at an advantage, because the prosecutor would not be permitted to use the statements except to the extent relevant to the rebuttal of Maldonado's neurocognitive defense.
Finally, I cannot find any justification for writ relief in this case based on the oft-cited criteria used to decide whether to grant writ review generally, even outside the context of discovery rulings. These criteria include whether: *786 "(1) the issue tendered in the writ petition is of widespread interest [citation] or presents a significant and novel constitutional issue [citation]; (2) the trial court's order deprived petitioner of an opportunity to present a substantial portion of his cause of action [citations]; (3) conflicting trial court interpretations of the law require a resolution of the conflict [citation]; (4) the trial court's order is both clearly erroneous as a matter of law and substantially prejudices petitioner's case [citations]; (5) the party seeking the writ lacks an adequate means, such as a direct appeal, by which to attain relief [citation]; and (6) the petitioner will suffer harm or prejudice in a manner that cannot be corrected on appeal [citations]." (Omaha Indemnity, supra, 209 Cal.App.3d at pp. 1273-1274.) For reasons already discussed, none of these criteria compels our interference with the trial court's handling of the parties' discovery squabble.
The majority opinion focuses on the sixth criteria in Omaha Indemnity, suggesting that Maldonado will suffer harm or prejudice that cannot be corrected by direct appeal. Specifically, the majority believes that Maldonado's legal remedy is inadequate because the guarantee of use and derivative use immunity no longer adequately protects Maldonado's Fifth Amendment right against self-incrimination. For reasons discussed next, the majority's concern is misplaced.

D. An Unnecessary New Rule Requiring a Daunting Procedure

Maldonado asserts, and the majority implies, that the only way to protect a defendant's constitutional right against self-incrimination is to make sure the People are barred not only from using, but even from hearing, any statement of the defendant that is incriminating and outside the scope of his waiver. We might think well of the majority's desire to protect a defendant's right against self-incrimination. The critical point for purposes of the petition now before us, however, is that neither the relief Maldonado seeks nor the majority's new rule is compelled by the right against self-incrimination. Furthermore, the problem of the majority's unnecessary intervention is compounded by the fact that the new procedure it ordains is burdensome, time consuming, and hampers a trial court's ability to address the competing interests and changing concerns inherent in a criminal proceeding.

1. No Significant Constitutional Issue or Irreparable Harm

Although Maldonado asserts a constitutional issue based on his right against self-incrimination, we do not bow our knee to every petition that invokes a constitutional right. The question is whether our intervention is necessary to protect a constitutional right or to resolve, immediately, a critical *787 constitutional question. The relief Maldonado seeks (and the relief the majority provides) is not necessary to protect Maldonado's constitutional rights.
The Fifth Amendment privilege against self-incrimination is violated at the time a self-incriminating statement is used against the defendant in a criminal trial. (United States v. Verdugo-Urquidez (1990) 494 U.S. 259, 264 [108 L.Ed.2d 222, 110 S.Ct. 1056]; Spielbauer, supra, 45 Cal.4th at p. 727.) There is no violation of the constitutional right against self-incrimination if the defendant is merely compelled to make a statement that incriminates him; the violation occurs only if the statement is used against him at trial, or if at trial some evidence is introduced that derives from the statement. (See Kastigar, supra, 406 U.S. at p. 453.) To put it another way, there is no constitutional right against the mere disclosure of a statement to the prosecution.
To guard against the improper use of a statement that has been disclosed, the courts have adopted the prophylactic rule of use and derivative use immunity. In Chavez, supra, 538 U.S. 760, a plurality opinion of the United States Supreme Court confirmed that a defendant's constitutional right against self-incrimination is protected by the rule requiring use immunity and derivative use immunity before compelling the defendant's statements. (Id. at pp. 770-771 (plur. opn. of Thomas, J.).) The court explained: "[There are] prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause. [Citations.] Among these rules is an evidentiary privilege that protects witnesses from being forced to give incriminating testimony, even in noncriminal cases, unless that testimony has been immunized from use and derivative use in a future criminal proceeding before it is compelled. [Citations.]" (Ibid.)[5] The import for our purposes is that use and derivative use immunity is sufficient to protect a defendant's Fifth Amendment right against self-incrimination. (See Kastigar, supra, 406 U.S. at p. 462 [federal government may compel testimony from a witness, over his objection on 5th Amend. grounds, by conferring immunity from use and derivative use].)
What Maldonado seeks, and what the majority in this case provides, ventures beyond the prophylactic rule of use and derivative use immunity, and compels the trial court to keep the prosecution from even knowing *788 Maldonado's potentially protected statements until the court has decided, after an in camera hearing, whether the statements fall within Maldonado's waiver. This additional procedure is not constitutionally required.
Maldonado's justification for this new prophylactic rule, which the majority opinion seems to accept, is that Maldonado might say something in the mental examinations which, although not used directly by the prosecutor, may benefit the prosecutor by leading to other evidence or perhaps a new case theory. This is problematic, the majority suggests, because it could be difficult for defendant to prove that the prosecutor's evidence or theory derived from a misuse of an incriminating statement Maldonado made during the examination. Although the majority urges that courts have acknowledged the risk of prosecutors misusing compelled statements and the difficulty of a defendant's proving misuse, these cases do not convince me that the majority's new procedure must be applied, or even that Maldonado's petition presents a novel or significant constitutional issue. In my view, they suggest the opposite.
In People v. Superior Court (Mitchell) (1993) 5 Cal.4th 1229 [23 Cal.Rptr.2d 403, 859 P.2d 102], the prosecution sought discovery in regard to the defendant's penalty phase evidence, before completion of the guilt phase. Our Supreme Court recognized that advance disclosure of the defendant's intended penalty phase evidence might jeopardize his guilt phase defense and potentially violate his privilege against self-incrimination. The court observed that any such problem could be resolved by deferring prosecution discovery of the defense penalty phase evidence pending the guilt and special circumstances determinations. (Id. at p. 1237.) However, the court did not hold that every trial court faced with the situation must delay the prosecutor's receipt of penalty phase evidence until after the guilt phase. It merely held that the trial court had discretion to delay the prosecutor's receipt of the evidence, leaving it to the trial court to determine if the prosecutor's discovery is "premature or constitutionally prohibited." (Id. at p. 1239.) I would agree the trial court should be left free to exercise its discretion.
A similar respect for trial court discretion was observed by a panel of this appellate district in Warford, supra, 160 Cal.App.3d 1035. There, the court rejected the appellants' argument that an in camera hearing should be conducted to evaluate the deponents' assertion of the Fifth Amendment privilege against self-incrimination: "We see no reason to mandate that hearings to determine the right to a Fifth Amendment privilege invariably be held in camera rather than in open court. As this course will be more appropriate in some cases than it will in others, we think it wiser to leave room for trial court discretion." (Warford, at p. 1048.) In the same vein, the court in Fuller, supra, 87 Cal.App.4th 299, ruled that granting use and *789 derivative use immunity to civil defendants would be one way a trial court could exercise its discretion in balancing the competing interests of a party seeking discovery and the defendants' right against self-incrimination. (Id. at pp. 307-310.)
Another case cited by the majority opinion is Garcia v. Superior Court (2007) 42 Cal.4th 63 [63 Cal.Rptr.3d 948, 163 P.3d 939]. There, our Supreme Court held that the trial court had discretion to allow the defendant to file an affidavit in support of a Pitchess motion (Pitchess v. Superior Court (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]) under seal, with a redacted copy to the city attorney, if the trial court found that was the only feasible way to protect information protected by the attorney-client privilege or work product doctrine. The court then proceeded to set forth a mandatory procedure of in camera review (similar to the procedure ordained by the majority in this case) to be followed whenever defense counsel wishes to file a Pitchess affidavit under seal. (Garcia, at p. 73.) The court expressly limited its opinion, however, to the protection of attorney-client and work product information. (Id. at p. 74, fn. 9.) This is a critical point, which distinguishes Garcia from the matter at hand. As the Garcia court noted in justifying the in camera review procedure: "`mere disclosure of client confidences and attorney work product to third parties, in itself, would violate these privileges.'" (Id. at p. 77, italics added.) Here, by contrast, mere disclosure of information for which there is a privilege against self-incrimination does not violate the defendant's constitutional right.
More to the point are three opinions from the Second, Fifth, and Eighth Circuit Courts of Appeals, all of which reject the constitutional necessity of the majority's type of prophylactic measure to protect a defendant's right against self-incrimination. (U.S. v. Stockwell, supra, 743 F.2d 123 (Stockwell); U.S. v. Hall (5th Cir. 1998) 152 F.3d 381, 399; U.S. v. Allen (8th Cir. 2001) 247 F.3d 741 (Allen), judg. vacated and cause remanded on other grounds sub nom. Allen v. United States (2002) 536 U.S. 953 [153 L.Ed.2d 830, 122 S.Ct. 2653].)
For example, in Stockwell, supra, 743 F.2d 123, the defendant contended the prosecutor should not have been permitted to listen to a tape recording of Stockwell's interviews with a psychiatrist during his psychiatric examination (on the issue of sanity). (Id. at p. 126.) The court disagreed, ruling as follows: "[W]hile we do not wish to encourage the practice of requiring defendants to submit to a psychiatric examination in the prosecutor's presence (either in person or through the use of a tape recording), such a procedure cannot be said to constitute a per se violation of [Federal] Rule 12.2(c) and the defendant's Fifth Amendment rights. The question whether Rule 12.2(c) and the defendant's right against self-incrimination have been violated in a *790 particular case hinges on the use to which the material obtained in the examination is put, and not primarily on the method by which the prosecutor learns of the results of the examination from the psychiatrist. As Stockwell concedes, the prosecutor has to obtain information about the results of the psychiatric examination in some manner. As long as the prosecutor restricts his or her use of the defendant's statements to the issue of insanity, there is no violation of the Rule or of the defendant's constitutional rights." (Id. at p. 127, italics added.)
In Allen, supra, 247 F.3d 741, the trial court ordered the defendant to undergo a psychiatric examination by a government-selected psychiatrist, and permitted one assistant prosecutor to begin evaluating the results of the examination before the sentencing phase, under an order not to divulge any of the results to the prosecution team until after completion of the guilt phase. (Id. at p. 773.) The court held that this disclosure to a "taint" prosecutor adequately protected the defendant, under a scheme in which the defendant would have the burden of producing some evidence of taint and the government would have the ultimate burden of persuading the court that the evidence is not tainted. (Id. at p. 773; citing Hall, supra, 152 F.3d 381, 399.) The court in Allen stated: "Additional prophylactic safeguards beyond this evidentiary framework, such as the sealing of exam results until after the completion of the guilt phase . . . may avoid later litigation but are not constitutionally required. [Citation.] We therefore decline to adopt any such rigid prophylactic rule in the name of the Constitution and leave the matter to the discretion of district courts, subject only to our review for abuse of discretion, which we do not find present in this case." (Allen, at p. 774, italics added.)
Also instructive are California and federal civil cases ruling that the trial court may compel a witness to answer deposition questions, over the witness's assertion of the Fifth Amendment privilege against self-incrimination, by granting the witness immunity against the use of the deposition answers in any criminal proceeding. (See, e.g., Kastigar, supra, 406 U.S. at p. 462; Kaufman, supra, 12 Cal.3d at pp. 427-429.) These cases confirm that providing use immunity and derivative use immunity is sufficient to protect a party's right against self-incrimination. If there is some inherent difficulty in a defendant's ability to prove that the prosecutor introduced evidence derived from a defendant's statements, it is a necessary and acceptable result of the balancing of interests at stake. Maldonado's petition therefore does not raise a constitutional issue worthy of extraordinary writ review.
Furthermore, as mentioned ante, the danger that Maldonado might make an incriminating statement and be unable to prove the prosecutor's derivative use is slight, based on the record before us. The statements Maldonado may *791 make will be in the context of examinations by court-appointed experts designed to determine whether he suffers from the neurocognitive deficits he asserts. These experts are neutral professionals charged with ascertaining Maldonado's medical or mental condition, not with gleaning admissions on behalf of the government to convict him of a crime. The possibility of compelled, self-incriminating statements outside the scope of Maldonado's waiver seems rather slim, thus reducing the need for the relief he requests and the prophylactic procedure the majority imposes.[6] It is, of course, petitioner's burden to establish his extraordinary need for the extraordinary writ he seeks.
Because, in light of the record in this case, Maldonado has not established a need to modify the trial court's order to protect his constitutional privilege against self-incrimination, and has not demonstrated that he will suffer irreparable harm in permitting the matter to proceed without our intervention, he has given us no basis for accepting review of his petition, let alone issuing a writ of mandate.

2. A Daunting Procedure That Unduly Interferes with Trial Court Discretion

Trial courts are better able to address the various and evolving developments in a criminal proceeding than we are able to foresee them. In the instant context, whether mental examinations create a risk of self-incriminating statements outside the scope of a defendant's waiver will depend largely on the nature of the case, the defendant's mental defense, and other matters that are best evaluated by the court involved in those proceedings. Once we establish a new rule in the name of a constitutional right, however, that rule arguably must be applied in every trial court, in every case, as to every defendant, regardless of slight nuances in the circumstances of the proceedings. The effect of our intrusion into the trial court's handling of discovery in this case, therefore, may prevent trial courts in other cases from *792 adopting other procedures that adequately protect the defendant's constitutional rights but are better suited to the circumstances of those cases. For this additional reason, we should not exercise our discretion to grant Maldonado extraordinary relief.
Although it may first appear that the majority opinion's new rule simply delays the criminal proceedings momentarily to give the defense a chance to object to self-incriminating statements, real-world practice will tell a different story. Initially, the trial court must set a deadline for the defense to seek protection for statements it does not want disclosed to the prosecutor. We have no way of knowing how many statements the defense might select out of the three examinations ordered in Maldonado's case, but the defense in this and other cases will have incentive to seek protection for as many of the defendant's statements as possible, out of concern (warranted or not) that the failure to do so might waive or limit his right to object to the use of the statement at trial.
Next, for each one of these statements, the trial court must determine in camera what statements should not be disclosed, applying a two-step analysis. First, the court must decide if the statement is subject to the privilege against self-incrimination, in that it is incriminatory, personal to the defendant, obtained by compulsion, and testimonial or communicative in nature. (Izazaga v. Superior Court, supra, 54 Cal.3d 356, 366.) Second, the court must decide if the statement falls within the scope of the waiver attendant to the defendant's assertion of a defense, in this case Maldonado's contention of neurocognitive deficits he purportedly suffers as a result of childhood brain trauma or congenital brain dysfunction. (See Buchanan, supra, 483 U.S. at pp. 422-123.)
It may not be easy for the trial court to determine if a statement by the defendant falls within the scope of his waiver, at an in camera hearing, upon a sealed record. Usually pertinent in such an inquiry is whether any of the examining expertshere a psychiatrist, a psychologist, and a neurologist relied on the statement in reaching his or her conclusions. Depending on the case, it may also be important to ascertain whether any expert the defense intends to call plans to rely on the statement, or whether an expert in any of these fieldsincluding one the prosecutor might intend to offerwould rely on the statement in reaching or rejecting the conclusion of the examining experts. (See Woods v. Superior Court (1994) 25 Cal.App.4th 178 [30 Cal.Rptr.2d 182] [trial court properly ordered disclosure of defendant's responses to standardized tests administered by a psychologist identified as a defense expert, where the psychologist relied on the response for his conclusions, he referred to the responses in his report, and the report was provided to the People]; see generally Brown v. United States (1958) 356 U.S. 148, *793 154-155 [2 L.Ed.2d 589, 78 S.Ct. 622] [the breadth of the defendant's waiver of the privilege against self-incrimination is determined by the scope of relevant cross-examination]; People v. Jantz (2006) 137 Cal.App.4th 1283, 1295 [40 Cal.Rptr.3d 875] [defendant waives privilege against self-incrimination in sanity trials to extent necessary to permit meaningful sanity examinations by defense and prosecution experts]; People v. Mazoros (1977) 76 Cal.App.3d 32, 44-45 [142 Cal.Rptr. 599] [prosecution entitled to review same information defense expert relied on to form his opinion of defendant's mental condition].)
Deciding the scope of the defendant's waiver may indeed pose a particularly knotty problem. First, it will probably take some time, because the trial court may not be able to make its in camera determination until the examiners have completed their reports and provided them to the court. Second, the issue may not be resolved merely by reviewing the experts' reports: although statements fall within the scope of the waiver if an expert relied upon them, statements are not necessarily outside the scope of the waiver merely because they are not specifically mentioned in the expert's report. Determination of the issue, therefore, may require some degree of attorney argument and perhaps further expert opinion. Third, the prosecutor is left at quite a disadvantage in this debate. During the trial court's in camera review of the defendant's statements and the experts' reports, it is unclear how the prosecutor may meaningfully weigh in on the issue of the scope of the waiver without knowing what the defendant said.
The prosecutor's ignorance of the defendant's statements has ramifications for trial as well. With the record of the in camera proceeding sealed, and the prosecutor unaware of the statements omitted or redacted from the reports, it will be difficult for the prosecutor to prepare for cross-examination of the court-appointed experts and any experts called by the defendant. The defendant, the defense attorneys, the defense experts, the court, and the court-appointed experts will all know what the defendant said; the prosecutor will not.
Furthermore, given the majority opinion in this case, this court may continue to be drawn back into the fray at each step of the procedure, as to each of the statements the defendant seeks to shield from disclosure, in every case in which the defendant asserts a mental defense and the prosecution requests an examination. Having concluded that the trial court's decision to permit the prosecutor to attend remotely the defendant's examination is subject to writ review, it may well be argued that the trial court's ensuing rulings on the amount of time the defense has to move for protection, whether the defendant's statements are subject to the privilege against self-incrimination, the scope of the defendant's waiver, and the application of the *794 waiver to each of the statements the defense seeks to withhold from the prosecution may also be subject to writ review.
The majority's new prophylactic procedure will plainly delay the trial for the defendant, the People, the witnesses, and the victim. And all of this time, effort, expense, and delay will occur on the mere speculation that the defendant might say something outside the scope of his waiver that the prosecutor will hearbut not be able to use anyway due to the trial court's subsequent determination that the evidence cannot be used at trial.[7]
The majority opinion points out that trial courts are familiar with in camera review, so its new procedure should not be "daunting." However, the daunting nature of the procedure stems not from trial court judges being ignorant of in camera proceedings, but from the fact that the proceedings take time and present difficult questions that may never need to be answered. The fact that trial courts are familiar with the in camera review process does not make it a good idea; nor does it provide any legitimate excuse to foist the procedure upon them in the absence of any demonstrated constitutional reason to do so.
There are, of course, other instances in which courts have approved a procedure that limits the ability of a party to present informed arguments during in camera proceedings. My point is simply that Maldonado has not established any justification for imposing such a process here. Similarly, while there are times when we must insist upon an expensive, time-consuming process in order to protect the constitutional rights of an accused, neither the law nor the record in this case suggests this is such a time.
To be sure, in some cases the procedure established by the majority opinion may be a good way for the trial court to exercise its discretion. In other cases, another procedure may be betteror at least acceptablesuch as the one affirmed in Allen, supra, 247 F.3d 741. There may even be cases in which the court need not order anything beyond the constitutionally required guarantee of use and derivative use immunity. Indeed, Maldonado's counsel at oral argument acknowledged that there may be various means by which a trial court could meet the demands of the Fifth Amendment. In view of the *795 reality that every criminal proceeding is different, with its own nuances and changing circumstances that the trial court is far better equipped to address than we are to predict, the commonsense approach is to permit the trial court to exercise its discretion in deciding what, if any, prophylactic measures should be required in addition to the standard rule precluding use immunity and derivative use immunity. There is plainly no need to impose one hard-and-fast procedure in every single case, and Maldonado has demonstrated no reason for us to do so at this juncture in this case.
In conclusion, Maldonado has not established that he will suffer incurable harm, or will lack any adequate legal remedy, if we do not grant him the relief he seeks. The absence of any constitutionally mandated need to provide him his requested relief or to impose the rule and procedure set forth in the majority opinion, and the potential for imposing a burdensome and often unnecessary procedure upon trial courts in other cases, confirms that our issuance of extraordinary writ relief is inappropriate. Maldonado's petition should be denied.
I dissent.
NOTES
[1] All further code references are to the Penal Code unless otherwise indicated.
[2] The prosecution is not seeking the death penalty.
[3] Maldonado argues that we must disregard the factual assertions in the People's return because the return was not verified. We need not decide whether the return needed to be verified, because we conclude that no additional facts alleged in the return are necessary to our resolution of the petition.
[4] Jones, Presiding Justice, and Bruiniers, Justice, concurring. Justice Needham "would deny the petition on the ground that petitioner possesses other adequate remedies at law, making writ relief inappropriate."
[5] See also Suezaki v. Superior Court (1962) 58 Cal.2d 166, 169-170 [23 Cal.Rptr. 368, 373 P.2d 432]; D. I. Chadbourne, Inc. v. Superior Court (1964) 60 Cal.2d 723, 727 [36 Cal.Rptr. 468, 388 P.2d 700]; Hiott v. Superior Court (1993) 16 Cal.App.4th 712, 714-715, 716 [20 Cal.Rptr.2d 157]; Soltani-Rastegar v. Superior Court (1989) 208 Cal.App.3d 424, 425 [256 Cal.Rptr. 255]; Spectra-Physics, Inc. v. Superior Court (1988) 198 Cal.App.3d 1487, 1490, 1493 [244 Cal.Rptr. 258]; Willis v. Superior Court (1980) 112 Cal.App.3d 277, 289 [169 Cal.Rptr. 301]; American Mut. Liab. Ins. Co. v. Superior Court (1974) 38 Cal.App.3d 579, 588-590 [113 Cal.Rptr. 561]; Sanders v. Superior Court (1973) 34 Cal.App.3d 270, 272-275 [109 Cal.Rptr. 770]; Atchison, Topeka & S. F. Ry. Co. v. Superior Court (1962) 208 Cal.App.2d 73, 76 [25 Cal.Rptr. 54]; Gene Compton's Corp. v. Superior Court (1962) 205 Cal.App.2d 365, 367-368 [23 Cal.Rptr. 250].
[6] See also Palay v. Superior Court (1993) 18 Cal.App.4th 919, 925 [22 Cal.Rptr.2d 839]; County of Alameda v. Superior Court (1987) 194 Cal.App.3d 254, 256-257 [239 Cal.Rptr. 400]; Smith v. Superior Court (1981) 118 Cal.App.3d 136, 138 and footnote 1 [173 Cal.Rptr. 145]; Huelter v. Superior Court (1978) 87 Cal.App.3d 544, 545-546 [151 Cal.Rptr. 138].
[7] See also Moskowitz v. Superior Court (1982) 137 Cal.App.3d 313, 315 [187 Cal.Rptr. 4]; Board of Trustees v. Superior Court (1981) 119 Cal.App.3d 516, 521-524 [174 Cal.Rptr. 160]; Morales v. Superior Court (1979) 99 Cal.App.3d 283, 286-287 [160 Cal.Rptr. 194].
[8] As the dissent notes, Prudhomme's holding on the merits has been superseded by constitutional amendment as explained in Izazaga v. Superior Court (1991) 54 Cal.3d 356, 370-371 [285 Cal.Rptr. 231, 815 P.2d 304] (Izazaga). (See dis. opn., post, at p. 782, fn. 2.) The dissent, however, cites no authority that overrules or questions Prudhomme on the issue of the propriety of writ review. The dissent argues Prudhomme is distinguishable on the ground the defendant there was not assured use immunity for the information he was ordered to disclose before trial. (Ibid.) We discuss the relevance of use immunity post.
[9] In this opinion, for purposes of simplicity, we use "psychiatric examination" as shorthand for any examination of a defendant's mental condition or mental health by a mental health expert, and we use "psychiatric evidence" as shorthand for any expert evidence on the mental condition of a defendant. Here, of course, the defense experts who examined Maldonado and two of the three experts appointed by the court to examine him were not psychiatrists, but psychologists, neuropsychologists, and neurologists.
[10] When we refer to the "results" of the examinations, we include a defendant's statements to the examiners, the raw data and results of any testing, and the reports and notes of the examiners.
[11] Proposition 115 (an initiative measure known as the "Crime Victims' Justice Reform Act" adding Cal. Const., art. I, § 30, subd. (c) and Pen. Code, § 1054 et seq.) was adopted by voters on June 5, 1990.
[12] The court did not reach the question of whether Evidence Code section 730 authorized such an order. (Verdin, supra, 43 Cal.4th at pp. 1109-1110.) In this case, the trial court relied on Evidence Code section 730 as authority for its order. As noted, we denied a writ seeking immediate review of the order and the Supreme Court denied review. The propriety of ordering Maldonado to submit to an examination under this statute is not before us in this writ proceeding, although, as we discuss, it may now be a moot question.
[13] The full subdivision provides:

"(1) Unless otherwise specifically addressed by an existing provision of law, whenever a defendant in a criminal action or a minor in a juvenile proceeding brought pursuant to a petition alleging the juvenile to be within Section 602 of the Welfare and Institutions Code places in issue his or her mental state at any phase of the criminal action or juvenile proceeding through the proposed testimony of any mental health expert, upon timely request by the prosecution, the court may order that the defendant or juvenile submit to examination by a prosecution-retained mental health expert.
"(A) The prosecution shall bear the cost of any such mental health expert's fees for examination and testimony at a criminal trial or juvenile court proceeding.
"(B) The prosecuting attorney shall submit a list of tests proposed to be administered by the prosecution expert to the defendant in a criminal action or a minor in a juvenile proceeding. At the request of the defendant in a criminal action or a minor in a juvenile proceeding, a hearing shall be held to consider any objections raised to the proposed tests before any test is administered. Before ordering that the defendant submit to the examination, the trial court must make a threshold determination that the proposed tests bear some reasonable relation to the mental state placed in issue by the defendant in a criminal action or a minor in a juvenile proceeding. For the purposes of this subdivision, the term `tests' shall include any and all assessment techniques such as a clinical interview or a mental status examination.
"(2) The purpose of this subdivision is to respond to Verdin v. Superior Court 43 Cal.4th 1096, which held that only the Legislature may authorize a court to order the appointment of a prosecution mental health expert when a defendant has placed his or her mental state at issue in a criminal case or juvenile proceeding pursuant to Section 602 of the Welfare and Institutions Code. Other than authorizing the court to order testing by prosecution-retained mental health experts in response to Verdin v. Superior Court, supra, it is not the intent of the Legislature to disturb, in any way, the remaining body of case law governing the procedural or substantive law that controls the administration of these tests or the admission of the results of these tests into evidence." (§ 1054.3, subd. (b), italics added.)
[14] At oral argument, Maldonado's counsel appeared to concede that earlier disclosure, at the close of the prosecution's case-in-chief, would be appropriate.
[15] Izazaga distinguished Brooks v. Tennessee (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891], which struck down a state court rule that required defendants to testify first in the defense case or not testify at all, on the ground that it dealt "with the special component of the Fifth Amendment protecting an accused's choice of whether or not to testify." (Izazaga, supra, 54 Cal.3d at p. 367, fn. 5.)
[16] Johnson also discusses three California cases, but concludes "it is not clear from these or other California cases under what circumstances questions about the defendant's conduct during or in relation to the charged offenses would be `necessary to permit a proper examination of [the defendant's asserted mental] condition.' Centeno[,supra,] 117 Cal.App.4th at [page] 40 . . . ." (Johnson, supra, 383 F.Supp.2d at pp. 1158-1159, first brackets in original.)
[17] Indeed, we could not do so without supplemental briefing because the matter has not been directly addressed in the parties' briefs, and because the issue was not litigated in the trial court.
[18] See also Federal Rules of Criminal Procedure, rule 12.2 (18 U.S.C.), which authorizes the court to order a defendant to submit to a psychiatric examination if the defendant intends to introduce expert evidence relating to any mental condition of the defendant bearing on the issue of guilt (Fed. Rules Crim.Proc., rule 12.2(b)(1), (c)(1)(B), 18 U.S.C.), and further provides, "No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant: [¶] (A) has introduced evidence ... requiring notice under Rule 12.2[(b)(1)]" (Fed. Rules Crim.Proc., rule 12.2(c)(4)(A), 18 U.S.C.). In other words, the rule expressly limits the prosecution's use and derivative use of a defendant's statements during a court-ordered psychiatric examination (1) to the specific mental condition issue the defendant raises at trial, and (2) only if the defendant "has introduced evidence" at trial.
[19] The Attorney General conceded at oral argument that derivative use of any statements which remain privileged is prohibited.
[20] Pitchess v. Superior Court, supra, 11 Cal.3d 531.
[1] By waiver, I simply mean the ramification of Maldonado's notice that he may assert a neurocognitive defense, to the extent it entitles the prosecution to conduct discovery in regard to that defense in order to prepare for trial.
[2] In Prudhomme v. Superior Court (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], a writ of prohibition was issued to restrain the trial court from enforcing an order compelling the defendant's attorney to disclose to the prosecution the names, addresses, and expected testimony of witnesses the defense intended to call at trial, because the record did not establish that the information could not possibly incriminate the defendant. Prudhomme is distinguishable from the matter before us, because in Prudhomme there was an imminent disclosure of information, and there was no agreement that the prosecution would not use the information to prove the defendant's guilt. Moreover, our Supreme Court has disapproved Prudhomme in light of the subsequent legislative enactment of reciprocal discovery laws. (Izazaga v. Superior Court (1991) 54 Cal.3d 356, 370-371 [285 Cal.Rptr. 231, 815 P.2d 304].)
[3] Roberts v. Superior Court (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309], on which the majority relies to explain the need for the availability of prerogative writs in discovery cases, confirms this distinction between self-incrimination claims and claims of other privileges. The court in Roberts indicated that writ review should be available because a person seeking to exercise a privilege must otherwise either face contempt for disobeying the court's order or succumb to the court's order and disclose the privileged information, which "could lead to disruption of a confidential relationship." (Roberts, supra, 9 Cal.3d at p. 336.) Roberts involved the psychotherapist-patient privilege, which, like the attorney-client privilege, is premised on protecting a relationship. (Id. at p. 333.) The privilege against self-incrimination does not. Roberts's rationale does not apply here.
[4] Perhaps Warford, supra, 160 Cal.App.3d 1035, reflects this point. There, the plaintiffs sought to compel nonparty deponents in California to answer questions and produce documents in a civil action in Hawaii, over the deponents' assertion of their Fifth Amendment privilege against self-incrimination. (Warford, at pp. 1038-1039.) The trial court denied the bulk of the plaintiffs' motion and their request for an in camera hearing. (Id. at p. 1039.) Noting that there is usually no writ review of discovery orders, the appellate court granted review in the casenot because there was a privilege or constitutional issue at stakebut because there was not going to be any final review of the underlying action in a California forum. (Id. at p. 1041; see also Fuller, supra, 87 Cal.App.4th at p. 304 [accepting writ review of discovery order because it involved a matter of first impression and importance, not specifically because it involved a refusal to answer a question on the ground of the constitutional privilege against self-incrimination].)
[5] In Chavez, an individual filed an action under 42 United States Code section 1983 against a police officer who interrogated him and obtained incriminating statements without advising him of his Miranda rights (Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]). No criminal case was instituted against the individual, and the statements were not used against him in a criminal proceeding. (Chavez, supra, 538 U.S. at pp. 764-765.) A plurality of the court ruled that the officer had qualified immunity from liability because his alleged violation of the Miranda prophylactic rule did not in itself violate the individual's constitutional rights. (Chavez, at p. 766.)
[6] In addition, the majority's new rule may not significantly affect a defendant's ability to establish derivative use. If Maldonado makes incriminating statements in response to inquiries about his neurocognitive condition, and those statements fall within the scope of his waiver, the prosecution would be entitled to know about those statements. The majority's procedure does not protect against the prosecutor then using those statements for some untoward purpose. Nor does it enhance Maldonado's ability to show derivative use in that instance. Only as to statements Maldonado may utter that are outside the scope of his waiverin essence, nonresponsive to the court-appointed examiners' questionswill Maldonado not have to worry about the potential for derivative use. The possibility of these nonresponsive statements is slight and, if they were made, any improper use of them would likely be more obvious and thus more readily proven by the defense.

This does not mean that the majority opinion leaves Maldonado without sufficient protection of his constitutional rights. He is already adequately protected by the rule precluding use and derivative use of his statements. The majority's new rule is merely icing on a cake already frosted.
[7] The time spent on the majority opinion's procedure will not always be offset by a savings in the time that would otherwise be spent on determining whether the defendant's statements can be used at trial, or whether the prosecutor is making derivative use of those statements. Ruling on the issue at the discovery stage will not necessarily dispose of the issue: some statements, permitted to be discovered by the prosecutor, may be deemed later by the defense to have become outside the scope of the waiver due to a change in legal theory or a decision not to call the expert who considered it relevant to his opinion. Moreover, it is quite likely that the defense will seek to shield far more statements than the prosecutor would intend to use at trial.